UNITED STATES of America
v.
CENTRAL CONTRACTING CO., INC.

Civ. A. No. 81-0834-R.

United States District Court,
E. D. Virginia,
Richmond Division.

Dec. 15, 1981.

Hays Gorey, Jr., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Thomas G. Slater, Jr., Richmond, Va., for defendant.

ORDER

WARRINER, District Judge.

On 11 September 1981, plaintiff filed its proposal for a consent judgment pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act. 15 U.S.C. § 16(b)–(h) (hereinafter the "Act"). Accompanying the proposal were a complaint, competitive impact statement, and a stipulation between the parties consenting to the entry of judgment subject to the terms of the Act. The Act directs the Court, after a waiting period of sixty days following the initial filing,

to proceed to a determination of whether the entry of the proposed consent judgment would be in the "public interest." 15 U.S.C. § 16(e).

The Act also sets out procedural requirements with which the parties are to comply. Notwithstanding the initial filing, the record was until very recently devoid of any indication that any of the procedures other than the original filing had been complied with.[1] These procedures are designed to publicize the events leading up to and culminating with the proposed consent judgment so that all persons who have an interest in the matter are adequately informed and afforded an opportunity to register their comments prior to the Court's making its determination. Where the parties ignore the procedures, not only is the public hampered in its efforts to provide the Court with information that the Court may find helpful, but also the silent record raises a specter, however incorrect in a given case, of the questionable practices which characterize some of these arrangements that Congress sought to guard against through passage of the Act. See 119 Cong.Rec. 24598 (1973).

Concern is expressed throughout the legislative history of the Act about the "great influence and economic power" of antitrust violators and the considerable pressure they can bring to bear on the Government and the courts in furtherance of their causes. S.Rep.No.93–298, 93rd Cong., 1st Sess. 5 (1973) (hereinafter "Senate Antitrust Report"); H.R.Rep.No.93–1463, 93rd Cong., 2d Sess. 6, reprinted in [1974] U.S.Code Cong. & Ad.News 6535, 6536. (hereinafter "House Antitrust Report").[2]

The testimony of the Honorable J. Skelly Wright in hearings on the Act before the Senate Antitrust and Monopoly Subcommittee was most explicit on this point.

By definition, antitrust violators wield great influence and economic power. They can often bring significant pressure to bear on government, and even on the courts, in connection with the handling of consent decrees.

The public is properly concerned whether such pressure results in settlements which might shortchange the public interest. . . .

. . . .

And because of the powerful influence of antitrust defendants and the complexity and importance of antitrust litigation, the public reasonably asks in many instances whether, in reaching a settlement, the Government gave up more than it need have or should have.

Some response to this public concern is desirable, . . . not only to insure that the compromise struck by the Justice Department is fair from the public's point of view, but also to alleviate fears which, even if unfounded, are unhealthy in and of themselves.

The Antitrust Procedures and Penalties Act: Hearings on S. 782 and S. 1088 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary, 93rd Cong., 1st Sess. 147 (1973) (hereinafter "Senate Antitrust Hearings"), quoted in 119 Cong.Rec. 24597–98 (1973).

Until 1972, the consent decree process was governed by internal Justice Department procedures which had been the subject of a critical report by the House Antitrust Subcommittee in 1959. The report, following extensive hearings on the consent decree process, concluded that, "the consent decree practice has established an orbit in the twilight zone between established rules of administrative law and judicial procedures." Report of the Antitrust Subcommittee (Subcommittee 5) of the Committee on the Judiciary, H. R. 86th Cong. 1st Sess., 302, Pursuant to H.R. Res. 27 authorizing the Committee on the Judiciary to conduct studies and investigations relating to certain matters within its Jurisdiction on Consent Decree Pro-

---

1. The Court notes that on 2 December 1981, some eighty-two days after filing of the proposed consent judgment, defendant filed its certification pursuant to Section 2(g) of the Act. 15 U.S.C. § 16(g).

2. The Court is not unmindful of the fact that the Government also has "great influence and economic power."

gram of the Department of Justice (1959), quoted in House Antitrust Report, supra, at 6537. Congress, with these two factors in mind, was particularly concerned with the potential for abuse arising from the "excessive secrecy with which many consent decrees have been fashioned," and the willingness of some courts to "rubber stamp" consent judgments. 119 Cong.Rec. 24598 (1973). See House Antitrust Report, supra, at 6537–40.

> One response to these concerns:
>
> has been an increasing willingness of district courts to shoulder the burden of making an independent determination as to whether a particular settlement is in the public interest.
>
> Not too long ago, it was fair to say that district courts "rubber stamped" proposed consent decrees. Some still do. Now, in contrast, many courts commonly attempt to ventilate the pros and cons of particular settlements, primarily by allowing the Justice Department, the defendant, and a wide range of outside interested parties to express their views through briefs and oral arguments. And in some instances, courts have rejected proposed decrees because they inadequately protected the public interest.
>
> This increased judicial scrutiny ... has had a salutory effect. It encourages the Department of Justice to be careful in arriving at a consent decree in the first place.
>
> Moreover, even after agreement between the parties, decrees have been modified and improved. What is most important, however, is that the salutory effects have been achieved without sacrificing the viability of the consent decree as a settlement device.

Senate Antitrust Hearings, supra, at 147–48 (Testimony of the Honorable J. Skelly Wright.)

The magnitude of opportunity for abuse is underscored by the fact that between 1955 and 1973, when the Act was first introduced, approximately 80% of all antitrust judgments were represented by consent decrees.[3] Moreover, present law encourages settlements by consent decree as part of the legal policies expressed in the antitrust laws by insuring that consent decrees are not available against defendants in public antitrust cases as prima facie evidence against defendants in subsequent private antitrust actions. See 15 U.S.C. § 16(a) & (h); House Antitrust Report, supra, at 6536–37. The House Report accompanying the Act emphasizes that, "[g]iven the high rate of settlement in public antitrust cases, it is imperative that the integrity of and public confidence in procedures relating to settlements via consent decree procedures be assured." House Antitrust Report, supra, at 6536. Senate Hearings on the Act revealed general agreement as to the need for "greater ventilation" of the consent decree process and an extension of the opportunity for informed public comment as a means to safeguard the process from possible abuse. 119 Cong.Rec. 24597 (1973) (remarks by Senator Tunney). See generally, Senate Antitrust Hearings, supra.

Accordingly, Congress drafted the Act so as to "transform a procedure which was generally accomplished in a series of private, informal negotiations between antitrust lawyers and attorneys for the defendant, into one that is exposed to the full light of public awareness and judicial scrutiny." 119 Cong.Rec. 24598 (1973). In so doing Congress attempted to "regularize and make uniform judicial and public procedures that depend upon the Justice Department's decision to enter into a proposal for a consent decree." Id. With this in mind, two guiding principles governed drafting of the Act. First, that the courts would be able to obtain the requisite information enabling them to make an independent determination, and second, that the consent decree process would be preserved as a viable settlement option. See Senate Antitrust

---

**3.** Senate Antitrust Hearings, supra, at 7. Since 1973 the annual percentage of antitrust judgments represented by consent decrees has risen to an average of approximately 92%. See "Civil Antitrust Cases Terminated," 1973–1981 (seriatim), Legal Procedures Unit, Antitrust Division, United States Department of Justice.

Report, supra, at 6–7; House Antitrust Report, supra, at 6538–39. See also 119 Cong. Rec. 24598 (1973).

The Act establishes specific procedures for each of the several stages of the consent decree process. In sum, the purpose and effect of these procedures are to require public disclosure of all steps leading to the proposed consent judgment and thereby to encourage additional comment from the public, to which the Justice Department must respond. If the prescribed procedures are flouted such an expectation will be thwarted. In the present case, the record is almost silent as to whether these procedures have been complied with, the Court having seen but one tardy submission subsequent to the original filings. The Court is of the opinion that the record should affirmatively show that both parties have complied with the requirements of the statute, particularly where there has been no response from the public.

1. The Government has failed to indicate whether the proposal for the consent judgment and the competitive impact statement have been published in the Federal Register. 15 U.S.C. § 16(b). The record is also silent as to whether a summary of the terms of the proposal for the consent judgment and a summary of the competitive impact statement have been published by the United States in newspapers of general circulation both in this district and in the District of Columbia. 15 U.S.C. § 16(c).[4]

2. Sections 2(b) and (d) of the Act provide that any written comments relating to the proposed consent judgment and any responses thereto by the United States should be both filed with the Court and published in the Federal Register. See 15 U.S.C. § 16(b) & (d). The Court is of the opinion that there should be an affirmative showing in the record if indeed no comments have been submitted to the Department of Justice pursuant to the Act. Further, in view of the supposed public interest in this lawsuit, the absence of public comment should be explained.[5]

3. The Court finds plaintiff's statement in Paragraph 7 of its competitive impact statement that it considered "no materials and documents ... determinitive" in formulating its proposal for a consent judgment to be almost incredible. Section 2(b) of the Act refers to "any ... materials and documents which the United States considered determinitive in formulating such proposal." 15 U.S.C. § 16(b). The Court is skeptical that *no* documents were significant in formulating the proposed consent judgment. If any documents were considered plaintiff should comply with Section 2(b) forthwith.

4. Section 2(g) is the only subsection of the Act made specifically applicable to the defendant. 15 U.S.C. § 16(g). It instructs the defendant to file, within 10 days of

---

**4.** The Act extended the publication deadline to sixty days prior to entry of judgment as a response to criticisms that the prior policy of 30-days was insufficient for meaningful public analysis and comment of both antitrust complaints and proposed consent decrees, especially in those situations where, despite congressional criticism, the Justice Department negotiated both the complaint and the proposed settlement thereof and filed them simultaneously with a district court. House Antitrust Report, supra, at 6537.

**5.** The value of such comments both to the Department of Justice and to the Court was stressed by Judge Wright in his testimony to the Senate Subcommittee on Antitrust and Monopoly.

The Antitrust Division of the Department of Justice, while no doubt among the most competent and dedicated groups of professionals in Government service, nevertheless is made up of human beings and, unfortunately, human beings occasionally make mistakes.

In approving a particular decree, the Justice Department attorneys may overlook certain issues, ignore certain concerns, or misunderstand certain facts. The participation of additional interested parties in the consent decree approval process helps correct these oversights.

The Department itself has modified consent decrees on a number of occasions as a result of public comment.

Senate Antitrust Hearings, supra, at 146. That the Department of Justice also recognizes the potential influence of public comment is reflected in its procedural regulations for receipt and consideration of written comments submitted under subsection 2(d) of the Act. See 15 U.S.C. § 16(d); 28 C.F.R. § 50.13 (1980).

filing the proposed consent judgment, a "description of any and all written or oral communications by or on behalf of such defendant, including any and all written or oral communications on behalf of such defendant, or other person, with any officer or employee of the United States concerning or relevant to" the proposed consent judgment. Id. Moreover, the defendant is to certify prior to the entry of any consent judgment that the requirements of this subsection have been satisfied. Id. The only communications with any officer or employee of the Government exempted from the requirements of this subsection are those "made by counsel of record alone with the Attorney General or the Department of Justice alone." Id. This limited exception reflects a balancing test distinguishing the "lawyering" contacts of defendants from their "lobbying" contacts. As stated in the House Report:

> Numerous contacts by counsel of record with antitrust enforcers occur as an incident to the filing of a case: these, and these alone, are excepted from disclosure. A "lobbying" contact includes a communication to antitrust enforcers by counsel of record accompanied by corporate officers or employees; or by attorneys not counsel of record whether or not they are accompanied by officers or employees of defendants or prospective defendants in those situations in which a simultaneous filing of a complaint and a proposed settlement occurs.

House Antitrust Report, supra, at 6540. See Senate Antitrust Report, supra, at 7. Thus, if an employee or officer of the defendant is present with counsel of record during negotiations with the antitrust department, those communications must be disclosed. Id. Although defendant has filed recently a certification pursuant to Section 2(g), such filing is long after the ten-day period specified in the Act. A full explanation of defendant's lapse will be required.

Only when the Court is satisfied that the parties have complied with all the procedural prerequisites incumbent upon them can the Court in good conscience proceed to exercise its authority, see 15 U.S.C. § 16(e) & (f), in making a determination as to whether the entry of the proposed consent judgment would be in the public interest. Accordingly, the Court will stay further consideration of this matter pending an affirmative showing that both parties have complied with all of the procedures set out in the Act.

And it is so ORDERED.