**UNITED STATES of America**

v.

**CENTRAL CONTRACTING CO., INC.**

Civ. A. No. 81–0834–R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 6, 1982.

See also, 527 F.Supp. 1101.

Hays Gorey, Jr., U. S. Dept. of Justice, Washington, D. C., Raymond A. Carpenter, Asst. U. S. Atty., Richmond, Va., for plaintiff.

Thomas G. Slater, Jr., Ray V. Hartwell, III, Hunton & Williams, Richmond, Va., for defendant.

## MEMORANDUM

WARRINER, District Judge.

On 19 February 1982, the government filed a motion for reconsideration and clarification of the order entered by this Court on 2 February 1982. *See United States v. Central Contracting Co., Inc.*, 531 F.Supp. 133 (E.D.Va.1982). *See also United States v. Central Contracting Co., Inc.*, 527 F.Supp. 1101 (E.D.Va.1981). Specifically, the government moves the Court to reconsider or clarify its position regarding the filing of "determinative" materials and documents, *see* 15 U.S.C. § 16(b), and its position regarding the necessity for and nature of any future publication that might be required of plaintiff or defendant. The Court will address each point in turn.

### I

The government remains steadfast in its position that, "[t]here were simply no documents or materials in this case that contributed materially to the formulation of the proposed relief. There is nothing to be disclosed." Pl.Br. at 7. Moreover, plaintiff argues that the language of the statute,[1] and policy dictate that this Court should not concern itself further with the matter once the United States has certified it considered no documents determinative, absent a showing of bad faith or malfeasance.[2]

Plaintiff recognizes that prior to the decisions in this case there has been no judicial construction of what is meant by the term "determinative" as used in the Act and suggests the literal definition of the word should apply in context with the legislative history of the Antitrust Procedures and Penalties Act. 15 U.S.C. § 16(b–h) (hereinafter "the Act"). The Court agrees. The dictionary definition of the adjective "determinative" is something "having power or tendency to determine" or "fixing or tending to determine the specific character." Webster's Third New International Dictionary (1971). To "determine" means "to come to a decision concerning [a matter] as the result of investigation or reasoning" or "to settle or decide by choice of alternatives or possibilities." The word can also mean "to establish causally: to bring about as a result" or "to set bounds or limits to": as "to fix the boundaries of" or "to limit in extent or scope." *Id.*

Plaintiff interprets this to mean that there must be a direct causal relationship

---

1. Section 2(b) of the Antitrust Procedures and Penalties Act requires disclosure of "materials and documents which the United States considered determinative...." 15 U.S.C. § 16(b).

2. Plaintiff refers the Court to *Sam Fox Pub. Co. v. United States*, 366 U.S. 683, 689, 81 S.Ct. 1309, 1312, 6 L.Ed.2d 604 (1961). The language in *Sam Fox* to which plaintiff refers dealt with whether the Court should question the advisability of the government having entered into a consent decree. The advisability of plaintiff's entering into a consent decree is not an issue at this point in the case. Moreover, as *Sam Fox* predates the Act, to the extent that the *dictum* therein is applicable, the force of its authority is lessened by the legislative mandate of the Act. *See United States v. Gillette*, 406 F.Supp. 713, 715 (D.Mass.1975).

between a decision by the Department of Justice and the documents or other materials that are to be considered determinative. There are numerous degrees of causality and plaintiff acknowledges that the level of causality necessary for a document to be considered determinative has not been judicially determined either. Plaintiff asserts, however, that the issue need not be decided in this case because: (1) no company documents or studies were submitted to plaintiff by the defendant in order to persuade plaintiff to accept any form of decree; (2) plaintiff received no special report or other advice recommending a particular remedy in this case; (3) none of the evidence accumulated during a grand jury investigation leading to a prior, related criminal conviction was considered "determinative" in formulating the proposed consent decree; and (4) the history of negotiations shows that defendant offered to submit to an injunction in the form of a similar decree entered against a co-defendant in a preceding criminal matter.

Plaintiff argues further that the legislative history of the Act supports a definition of "determinative" which excludes "evidentiary materials" obtained by the government in a given case. To support its position, and to demonstrate its concept of a determinative document, plaintiff provides an extended narrative and analysis of the events which led Congress to enact legislation that became the Act. The Act emerged in the wake of questions surrounding the "Dita Beard Memo" and three consent decrees entered into by the United States in antitrust suits against International Telephone & Telegraph Company (ITT).[3] The three ITT cases were all filed by the Department of Justice in 1969 by Richard W. McLaren, Assistant Attorney General for the Antitrust Division. The suits challenged ITT's acquisition of the Hartford Fire Insurance Company (Hartford), Grinnell Corporation (Grinnell), and Canteen Corporation of America (Canteen), and sought divestiture. The three cases were settled in 1971 by consent decrees requiring divestiture of Grinnell, Canteen and two other companies, but permitting ITT to keep Hartford.

Concern arose the following year amidst allegations linking settlement of the ITT cases with a commitment of $400,000 by ITT to assist the City of San Diego in preparation for the upcoming Republican National Convention. Extensive congressional hearings established that ITT had engaged in an extensive lobbying campaign throughout the Nixon Administration in an effort to obtain relief from the antitrust litigation. The effort included meetings with Deputy Attorney General Richard G. Kleindeinst and McLaren which, in part, resulted in McLaren commissioning an independent study of the "Economic Consequences of a Hartford Divestiture by ITT" (hereinafter the "Ramsden Report"). Following receipt of the Ramsden Report, McLaren recommended to Kleindeinst, *inter alia*, that the need for a divestiture of Hartford was outweighed by a projected adverse effect on the stock market and the economy.[4]

Plaintiff asserts that the Ramsden Report and documents of like flavor are what Congress meant by a determinative document. The Ramsden Report had substantial impact on McLaren's thinking about the divestiture of Hartford and was pivotal in the decision by the Antitrust Division to accept a settlement substantially different

---

3. *See* Pl.Br. at 7–18. *See also*, Handler, *Antitrust-Myth and Reality in an Inflationary Area*, 50 N.Y.U.L.Rev. 211, 239–44 (1975); Note, *Construction and Modification of Antitrust Consent Decrees: New Approaches After the Antitrust Procedures and Penalties Act of 1974*, 77 Col.L.Rev. 296 (1977). Concern about the consent decree process and recommendations to modify it, however, date back to 1959. *See United States v. Central Contracting Co., Inc., supra*, 527 F.Supp. 1101 at 1102 (E.D.Va.1981).

4. These recommendations were based in part on the Ramsden Report which was solicited for purposes other than as a settlement study, relied upon for conclusions the author said were not his own and was subsequently criticized by other financial analysts. All this took place during the Watergate media hysteria. Pl.Br. at 15–16.

from the relief the Division originally had sought.

## II

The Court agrees that the Ramsden Report was a determinative document—in the phrase of the day it was a "smoking gun." In most cases, however, such a single document will not exist, rather a determination to proceed on a given course will be reached upon an aggregate of information. Such information in this day of "word processing" presumably is collected and communicated in document form. In turn, the aggregate of these documents and other materials leads the Justice Department to a conclusion that it should enter into a consent decree. And yet, by its own statistics, the Department of Justice states that out of the 188 cases that have settled by consent decree since the enactment of the Act, only 16 have involved "documents [and other materials] which the government considered determinative in formulating the relief." Pl.Br. at 6. If this be true, (and given the Justice Department's construction of the Act, the Court does not doubt its truth) then the directive in the Act is either superfluous, or it is being misinterpreted or subverted. The Court presumes that Congress did not intend legislation to be superfluous and the Court is satisfied that the Justice Department would not intentionally subvert the dictates of that body.

The government endeavors to justify the paucity of determinative documents by contrasting the ITT context, replete with its lurid allegations of subversion at the highest levels of government, with the relatively obscure parties and minor importance of the instant case. Plaintiff distinguishes ITT from the instant case on two grounds. First, ITT was a "big case" involving the application of antitrust theories in a novel area, whereas the instant matter is a relatively small-time bid-rigging and price-fixing case, involving established principles of law. Second, the ITT cases were significant civil cases unrelated to any prior criminal prosecution, whereas the instant matter was a "tag-along" civil case filed after a guilty plea in a criminal case. Plaintiff argues that these differences indicate the dangers Congress saw in the ITT situation but which are unlikely to occur here. Congress was simply not concerned with the sorts of documents and materials that accompany little cases like this. Pl.Br. at 18. The Court is aware of the differences between ITT and Central Contracting. The Court is also aware that Congress enacted a law whose basic purpose is to substitute the "sunshine" of disclosure from chummy dealings *in every case.* In so doing, Congress has mandated that the courts play a more active role in the consent decree process than was the previous practice.[5]

The need for scrutiny is important in any case, but judicial scrutiny is perhaps more important in a run-of-the-mill case on which public attention is not focused and where abuse may escape unnoticed than in a "big case" where public interest supplements the court's scrutiny. If the Court in this case doesn't scrutinize there will be no independent scrutiny.

## III

Plaintiff suggests that it is not unusual for there to be no determinative documents even in the most complicated of cases. *Cf., United States v. AT&T,* Civ. No. 74–1698 (D.D.C.) (dismissal of monopolization suit against AT&T in which Justice Department has agreed to abide by provisions of the Act). That view, in the opinion of the Court, is based upon a misinterpretation of the Act. The Act clearly does not require a full airing of Justice Department files but the Court cannot countenance plaintiff's claim that though Congress enacted sunshine legislation the courts may blandly (and blindly) accept government certification in case after case that no documents or materials, by themselves or in the aggregate, led to a determination by the government that it should enter into a consent decree.

5. *See* Note 3, *supra.*

Plaintiff's brief and accompanying affidavit, rather than convincing the Court that there were no documents "that substantially contribute[d] to the determination [of the Department of Justice] to proceed by consent decree," *United States v. Central Contracting Co., Inc.*, 531 F.Supp. 133, 134 (E.D. Va.1982), convinces the Court that such documents must exist. Hayes Gorey, Esq., the writer of the government's brief, has been plaintiff's counsel both in this matter and in prior criminal proceedings related to this case. The present matter was instituted by the Justice Department following a criminal case in which Central Contracting was one of three co-defendants. *United States v. Ashland-Warren, Inc., et al.*, Cr.No. 80–00022–R (E.D.Va.1980). Central Contracting entered into a plea bargain whereby it agreed to plead guilty and, *inter alia*, to accept a civil injunction in the same form as a judgment entered previously against another co-defendant, Rea Construction Company. The criminal case resulted from indictments returned by a grand jury against the three co-defendants. During the grand jury investigation, numerous evidentiary documents and materials were obtained by the government. Plaintiff states that such evidence and materials were not considered determinative in formulating the relief embodied in the proposed consent decree. This claim is, of course, believable under the government's construction of the Act. It is incredible under the Court's construction.

■ Plaintiff argues that even if such evidence were determinative, it would be protected from disclosure by Rule 6(e) of the Federal Rules of Criminal Procedure. Plaintiff cites no authority to support its position. However, the court is of the opinion that to the extent an affirmative showing of a particularized need is necessary to require disclosure of grand jury materials, the mandate of Congress, as set out in the Act, is sufficient to meet this need. To claim otherwise would be to allow the parties, if they so desired, to circumvent with impunity the dictates of the Act by hiding documents within the penumbra of the grand jury investigation. Accordingly, though the Act does not authorize plundering of grand jury records, in a proper case, a determinative document would not necessarily be protected from disclosure because it was obtained during grand jury proceeding of grand jury records, in a proper case *Cuisinarts, Inc.*, 665 F.2d 24 (2d Cir. 1981). *See also United States v. Colonial Chevrolet Corp.*, 629 F.2d 943 (4th Cir. 1980).

V

Neither plaintiff, nor Gorey in his affidavit, contends the decision to proceed with the consent decree was an idea that came out of the blue. Rather, the idea emerged through consideration of compiled information concerning the alleged offense, the nature of the defendant and its business, the relative merits of proceeding with a criminal or civil action, or both, and other miscellaneous relevant factors. Among these, Mr. Gorey refers to a letter of 23 May 1980 from Mr. Slater, counsel for defendant, to Eliot Norman, an Assistant United States Attorney. Gorey affid., at 2. That letter, according to the affidavit, "relates information concerning the history of the [defendant] company and its affiliates, provides background information concerning its officers, summarizes counsel's view of the conduct of the company in regard to the violation charged in the indictment and provides financial information concerning the company and its affiliates—Mr. Slater stated that he was prepared to recommend that Central settle the criminal case and all future litigation with the United States by agreeing, *inter alia*, to accept 'a consent decree similar to the one agreed to by Rea.'" *Id.*

■ The Slater letter[6] provides information in this case that is similar to but more pertinent than was provided by the Ramsden Report in the ITT cases. The Slater

---

6. While 15 U.S.C. § 16(g) provides an exception for communications between counsel, this exception applies only to defendant's disclosure requirements. Subsection 16(b) relating to disclosure by the government calls for "any . . . materials and documents" without exception and with the limitation only that they be "considered determinative."

letter provided the government with an economic analysis of the defendant, with a view as to defendant's legal position, and expressed defendant's attitude towards settlement. The eventual disposition of the criminal and the civil cases apparently tracked the language of the letter. The Court assumes, nothing more appearing, that this letter laid the foundation for both the plea agreement and the consent decree. The letter differs, by Mr. Gorey's description, from the Ramsden Report in that the letter probably confirmed for the government the course which it already had considered taking rather than influencing it to change course. Such a document strikes the Court nevertheless as being determinative as there appears to be an obvious and substantial causal tie between the letter and the determination to proceed by consent decree.

## VI

 The government further moves the Court to determine whether the plea agreement entered in the preceding criminal case is a determinative document. The government notes that the agreement is already a public document in the file of the criminal matter and that, in the plaintiff's view, it is not the sort of document Congress was referring to in the Act. There can be no question that the very words of the plea agreement with Central Contracting contributed substantially in "set[ting] the bounds or limits" of the consent decree. Not every plea agreement that precedes a consent decree perhaps will be a determinative document but in this case it appears to be. That the plea agreement is already a public document does not foreclose the need for its inclusion in the list of determinative materials and documents which the Act mandates to be published. *See* 15 U.S.C. § 16(c). There is no "public documents" exception by words nor is there such an exception by necessary implication. The Court, of course, cannot know whether other documents or materials are determinative in this case. The Court must rely on plaintiff to review its files to determine whether additional materials and docu-

ments come within the limits set by Congress.

## VII

The Court is mindful of the sensitive balance that must be struck in its review of proposed consent decrees—on the one hand fulfilling the mandate of the Act while on the other not being such a bother to the parties as to render the consent decree an unattractive alternative to a trial on the merits. *See United States v. Gillette*, 406 F.Supp. 713, 715 (D.Mass.1975). The balance is not so difficult, however, at this early procedural stage where the Court is not yet required to examine the "public interest" in the consent decree. Rather, the Court here is confronted by an apparent misinterpretation of a procedural requirement.

 The Court simply cannot accept an interpretation of legislation that permits the government to assert in 172 out of 188 cases that it considered neither documents nor any other materials determinative in reaching its conclusion to enter into a consent decree. To reiterate, the Act as interpreted by this Court requires the government to disclose "[t]he materials and documents that substantially contribute to the determination [by the government] to proceed by consent decree . . . . . " *United States v. Central Contracting Co., supra*, at 134 (E.D.Va.1982). This does not require full disclosure of Justice Department files, or grand jury files, or defendant's files, but it does require a good faith review of all pertinent documents and materials and a disclosure of those which meet the above criterium.

## VIII

Plaintiff also moves the Court to reconsider or clarify its position regarding republication of notices that had previously been published by the government. Under the facts of this case, considering there has been absolutely no public comment in response to prior publications, the Court will not require re-publication of materials pre-

viously published by the government. Accordingly, plaintiff is hereby directed to publish, pursuant to 15 U.S.C. § 16(c)(iii), a list of determinative materials and documents which shall include, but is not limited to, the plea agreement entered into by Central Contracting in the preceding criminal case, the letter from Slater to Norman, and any other materials and documents, including grand jury materials, if any, which the government considers determinative as previously defined. Such publication shall make reference to all prior notices that have been published in connection with this case and the context in which the present list is being published.

Future publications shall conform to the Court's directions regarding method of publication. *See United States v. Central Contracting, supra*, at 134 (E.D.Va.1982). The government's compliance with the statutory directive to publish "for 7 days over a period of 2 weeks" by one Saturday publication in the first week and six publications in the second week, is indicative to its approach to the Act as a whole—grudging.

## IX

Plaintiff also moves the Court to reconsider or clarify whether defendant's failure to file certain statements within ten days of the filing of the proposed consent decree necessitates republication of the aforementioned notices. For the reasons set forth in the previous section, no further publication will be required.

Plaintiff, following appropriate publication, shall file proof substantiating all published materials in conformity with the Court's order of 2 February 1982. At such time, the Court will proceed with such other determinations as are mandated by the Act.

And it is so ORDERED.