**UNITED STATES of America, Plaintiff,**

v.

**ALEX. BROWN & SONS, INC.,
et al., Defendants.**

**No. 96 Civ. 5313 (RWS).**

United States District Court,
S.D. New York.

Nov. 26, 1996.

As Amended Dec. 3, 1996.

U.S. Department of Justice, Antitrust Division, Washington, DC (Hays Gorey, Jr., Andrea Limmer, John D. Worland, Jr., Jessica N. Cohen, of counsel), for United States of America.

Shearman & Sterling, New York City (James T. Halverson, Joseph T. McLaughlin, Grant J. Esposito, J. Nicholas Graydon, of counsel), for Defendants.

Fine, Kaplan and Black, Philadelphia, PA (Arthur M. Kaplan, of counsel), Robert A. Skirnick, Lovell & Skirnick, New York City (Christopher Lovell, of counsel), Milberg Weiss Bershad Hynes & Lerach, San Diego, CA (Leonard B. Simon, of counsel), for Intervenors.

## OPINION

SWEET, District Judge.

The plaintiffs in a private civil antitrust damages action, *In re Nasdaq Market–Makers Antitrust Litigation* (hereafter, "Plaintiffs"), have moved to intervene or appear as *amici* in this civil action (the "Government Action") brought by the Antitrust Division of the Department of Justice (the "DOJ" or the

"Government"). Plaintiffs seek to compel filing and publication of a "Settlement Memorandum" (and all evidentiary materials referenced therein) prepared by the DOJ and to challenge a provision of the proposed Consent Decree in this action.

For the reasons set forth below, the Plaintiffs' motion to intervene for the limited purposes described will be granted. Their motion to compel disclosure of the Settlement Memorandum and underlying materials will be denied, and their objection to the consent decree will be considered, along with other materials provided by the Government and through the public comment process, at the time this Court determines whether entry of the Consent Decree is in the public interest.

*Parties*

The parties, facts and prior proceedings in the *In re Nasdaq Market–Makers Antitrust Litigation*, M.D.L. No. 1023 (the "Multidistrict action" or the "Private action") are described in the prior opinions of this court, familiarity with which is assumed. *See In re Nasdaq Market–Makers Antitrust Litigation*, 894 F.Supp. 703 (S.D.N.Y.1995); 164 F.R.D. 346 (S.D.N.Y.1996); No. 94 Civ. 3996, 1996 WL 187409 (S.D.N.Y. Apr. 18, 1996); 929 F.Supp. 723 (S.D.N.Y.1996); 929 F.Supp. 174 (S.D.N.Y.1996); 938 F.Supp. 232 (S.D.N.Y.1996).

In this Government action, defendants Alex. Brown & Sons Inc., Bear, Stearns & Co., Inc., CS First Boston Corp., Dean Witter Reynolds, Inc., Donaldson, Lufkin & Jenrette Securities Corp., Furman Selz LLC, Goldman, Sachs & Co., Hambrecht & Quist LLC, Herzog, Heine, Geduld, Inc., J.P. Morgan Securities, Inc., Lehman Brothers, Inc., Mayer & Schweitzer, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Morgan Stanley & Co., Inc., Nash, Weiss & Co., Olde Discount Corp., Paine Webber Inc., Piper Jaffray Inc., Prudential Securities Inc., Salomon Brothers Inc., Sherwood Securities Corp., Smith Barney Inc., Spear, Leeds & Kellogg, LP, and UBS Securities LLC (col-

lectively, the "Defendants") are or were market-makers on the Nasdaq exchange and purchased and sold stock on Nasdaq.

The Plaintiffs in the Multidistrict action, who seek to intervene here, include the State of Louisiana, in its capacity as *parens patriae*, trustee, guardian, and representative of Louisiana investors allegedly damaged by the alleged price-fixing scheme, and numerous individual plaintiffs who purchased or sold specified Nasdaq Securities from market-makers or their affiliates.

*Background and Prior Proceedings*

On May 27, 1994, the first class action complaint in what has become a multidistrict case, *In re NASDAQ Market–Makers Litigation*, MDL 1023, was filed, following reports in the media of a study by Professors William G. Christie and Paul H. Schultz discussing the "spread" between what market-makers on the Nasdaq exchange offer to pay sellers for certain securities and the price at which they offer to sell the securities to buyers. The complaint alleged improper manipulation of spreads through, *inter alia*, a convention among brokers to not quote "odd eighths" on certain securities. Eventually more than two dozen complaints were filed around the country by various plaintiffs alleging variations on the charge that the NASDAQ market-makers had engaged in a conspiracy to avoid odd-eighth quotes in violation of the Sherman Act, 15 U.S.C. § 1. On October 14, 1994, the Judicial Panel on Multidistrict Litigation ordered that the actions already filed and any actions filed later be assigned to this Court. A "Consolidated Amended Complaint" was filed on December 16, 1994. More than thirty actions involving thirty-three defendants have now been consolidated in this Court as part of the multidistrict litigation.[1]

In October 1994, the Antitrust Division of the Department of Justice (the "DOJ" or the "Government") announced that it was undertaking a broad review of a number of aspects of NASDAQ's market structure.[2] In its

---

[1.] A more complete description of the background and proceedings in the companion Multidistrict Action is set forth in the Opinion in that action issued by the Court today.

[2.] At least two other investigations into the operation of the Nasdaq exchange have been commenced. On November 14, 1994, the Securities and Exchange Commission (the "SEC") announced that it would review the operation of

Competitive Impact Statement (the "CIS"), the Government describes its inquiry as "a major, two-year investigation by the Department of the trading activities of Nasdaq securities dealers." The investigation actually began in the summer of 1994, shortly after the public disclosure of the economic study by Professors Christie and Schultz.

During the course of its investigation, the Government reviewed thousands of pages of documents that were produced by the twenty-four Defendants in this action and other market participants in response to over 350 Civil Investigative Demands ("CIDs") issued by the DOJ. The DOJ reviewed hundreds of responses to interrogatories that were submitted by the Defendants and others. The DOJ took over 225 depositions of individuals with knowledge of the trading practices of Nasdaq market-makers, including current and former officers and employees of the Defendants and other Nasdaq market-makers, as well as officials and committee members of the National Association of Securities Dealers, Inc. ("NASD"), the organization responsible for oversight of the Nasdaq market.

The DOJ conducted numerous telephone and in-person interviews of current and former Nasdaq stock traders, Nasdaq investors, and others with relevant knowledge of the industry, and listened to approximately 4500 hours of audio tapes of telephone calls between stock traders employed by the Defendants and other Nasdaq market-makers. These audio tapes had been recorded by certain of the Defendants (and other market-makers) in the ordinary course of their business and were produced to the Government in response to its CIDs.

The DOJ reviewed and analyzed substantial quantities of market data, including information showing all market-maker quote changes on Nasdaq during a twenty-month period. The DOJ also reviewed eighteen months of data on trades in Nasdaq stocks. Finally, the DOJ reviewed numerous transcripts of depositions taken by the Securities

and Exchange Commission ("SEC") in its concurrent inquiry into the operations and activities of the NASD and the Nasdaq market.

Based on the evidence uncovered during this substantial investigative effort, the Government concluded that the Defendants and others had been engaged for a number of years in anticompetitive conduct in violation of the Sherman Act.

On July 17, 1996, the Government filed the complaint in this civil action, pursuant to Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, seeking equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1. In its complaint, the Government alleged that the Defendants and others adhered to and enforced a "quoting convention" that was designed to and did deter price competition among the Defendants and other market-makers in their trading of Nasdaq stocks with the general public. The Government believed that investors incurred higher transaction costs for buying and selling Nasdaq stocks than they would have incurred had the Defendants not restrained competition through their illegal agreement.

On the same day as the complaint in the Government action was filed, the United States and the Defendants filed a Stipulation and Order ("proposed Order" or "proposed Consent Decree") to resolve the allegations in the complaint. The Government contends that the proposed Order will eliminate the anticompetitive conduct identified in the complaint and establish procedures that will ensure that such conduct does not recur. Specifically, the proposed Order seeks to prevent the Defendants from agreeing with other market-makers to adhere to the quoting convention, or to fix, raise, lower, or maintain prices or quotes for Nasdaq securities. The proposed Order also requires each defendant to adopt an antitrust compliance program and designate an antitrust compliance officer to ensure the firm's future compliance with the antitrust laws. To this end, the proposed

---

NASDAQ, including the spreads issue alleged in the Consolidated Amended Complaint and broader issues concerning the structure of the market itself. On November 20, 1994, the National As-

sociation of Securities Dealers ("NASD") announced the formation of a seven-member panel to undertake a plenary review of the effectiveness of its own operation and surveillance.

decree requires the compliance officer to: (1) randomly monitor and tape record telephone conversations between stock traders; and (2) report any violations of the proposed Order within ten business days to the Antitrust Division of the Department of Justice.

The proposed decree also requires that these tape recordings be made available to the DOJ for its review. The proposed Order gives the DOJ authority to receive complaints of possible violations, to visit Defendants' offices unannounced to monitor trader conversations as they are ongoing, to direct taping of particular suspected violators, and to request copies of tapes as they are made.

Paragraph IV(C)(6) of the proposed Order provides:

> Tapes made pursuant to this stipulation and order shall be retained by each defendant for at least thirty (30) days from the date of recording, and may be recycled thereafter. Tapes made pursuant to this stipulation and order shall not be subject to civil process except for process issued by the Antitrust Division, the SEC, the NASD, or any other self-regulatory organization, as defined in Section 3(a)(26) of the Securities Exchange Act of 1934, as amended. Such tapes shall not be admissible in evidence in civil proceedings, except in actions, proceedings, investigations, or examinations commenced by the Antitrust Division, the SEC, the NASD, or any other self-regulatory organization, as defined in Section 3(a)(26) of the Securities Exchange Act of 1934, as amended.

In this opinion, Paragraph IV(C)(6) will be referred to as the "non-disclosure" provision or the "prospective protective order."

In the course of conducting its investigation, the Government prepared a "Settlement Memorandum," or "briefing book," which was shared with Defendants in settlement negotiations. The document summarizes selected evidence compiled in the course of the investigation and sets forth some of the legal underpinnings of the Government's case. The purpose of the Memorandum was to facilitate negotiations by demonstrating to Defendants the supposed strength of the Government's case. In order to disclose the evidence obtained through CIDs issued by DOJ, those who responded to CIDs signed limited waivers. These waivers permitted the DOJ to disclose evidence otherwise protected by the confidentiality provisions of the Antitrust Civil Process Act (the "ACPA"), 15 U.S.C. § 1313(c), only to Defendants and potential defendants and only for the purpose of settlement negotiations with these Defendants and potential defendants.

Entry of the proposed Consent Decree is subject to the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. § 16. On July 17, 1996, in accordance with procedures outlined in the APPA, the Government submitted materials to the Court, including a Competitive Impact Statement ("CIS") summarizing the evidence supporting the allegations in the complaint and describing the resolution set forth in the proposed Decree. The Government also published proposed settlement documents in the Federal Register and newspapers, thus initiating the process of public comment and court consideration of the proposed consent decree required by the Tunney Act.

Plaintiffs filed notice of the instant motion on August 28, 1996, the Court received opposition and reply papers, and oral argument was heard on October 16, 1996. Plaintiffs simultaneously filed a motion in the Multidistrict Action seeking to compel production of all CID deposition transcripts in the Multidistrict Defendants' control and the Settlement Memorandum and evidentiary materials referenced therein. Post-argument submissions were received until November 15, 1996, at which time the matter was deemed fully submitted.[3]

### Discussion

### I. The Motion to Intervene Will Be Granted for the Limited Purposes Advanced

The Tunney Act, 15 U.S.C. § 16, was designed to expose consent decree proceedings to public scrutiny in order to en-

---

**3.** Plaintiffs' discovery motion in the companion Multidistrict action is decided by a separate opinion issued by this Court today. On November 15, 1996, the Government filed its Response to Public Comments and moved for entry of the proposed Order.

hance the likelihood that antitrust decrees would serve the public interest in eliminating anticompetitive behavior. *See* H.Rep. No. 93–1463, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 6535, 6536 ("it is imperative that the integrity of and public confidence in procedures relating to settlements via consent decree procedures be assured"); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C.Cir.1995) (purpose of Tunney Act was to prevent judicial "rubber stamping" of antitrust consent decrees).

Section 16 of Title 15 of the United States Code provides for a process of judicial consideration and public scrutiny of proposed consent decrees. Section 16(b) requires that certain materials be filed with the court and published in the Federal register for public comment. Section 16(c) provides for publication of summaries of certain materials in newspapers. Section 16(d) requires the Government to respond to public comments on the proposed decree. Section 16(e) directs the district court to determine whether the proposed consent decree is in the public interest, considering several enumerated factors, before entering judgment on the decree. Section 16(f) permits the court to use a number of procedures to gather additional information in making its public interest determination, including taking testimony and appointing special masters. Section 16(g) requires defendants to disclose lobbying contacts with any officer or employee of the United States concerning the proposed decree.

Section 16(f)(3) provides that, in making its determination as to whether the entry of a consent decree is "in the public interest," the Court may:

> Authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, *intervention as a party pursuant to the Federal Rules of Civil Procedure*, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate . . . .

(emphasis added).

Moreover, in making its public interest determination, a court may consider "the impact of entry of [a consent decree] upon the public generally and individuals alleging specific injury from the violations set forth in the complaint. . . ." 15 U.S.C. § 16(e)(2). Permitting plaintiffs in a treble damages action to intervene in a parallel Tunney Act proceeding may assist the court in determining the impact of the proposed consent decree on the interests of those private litigants alleging injury.

Plaintiffs move for mandatory intervention pursuant to Rule 24(a)(2), Fed.R.Civ.P., or, in the alternative, permissive intervention pursuant to Rule 24(b), Fed.R.Civ.P. Because Plaintiffs will be permitted to intervene pursuant to Rule 24(b), the Court need not address whether Plaintiffs satisfy the standards for mandatory intervention.

■ A court has discretion to allow permissive intervention in a consent decree proceeding such as this. *See, e.g., United States v. American Cyanamid Co.*, 719 F.2d 558, 563 (2d Cir.1983) (affirming permissive intervention in antitrust consent decree proceedings); *United States v. American Telephone and Telegraph Co.*, 552 F.Supp. 131, 218–19 (D.D.C.1982) (intervenor status granted in antitrust consent decree proceedings; intervenors permitted to file briefs, participate in proceedings and oral argument, and appeal the entry of the consent decree), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

■ Moreover, our Court of Appeals has suggested that intervention under Rule 24 is the proper mechanism for a non-party to seek modification of a protective order and thus to gain access to information generated through judicial proceedings. *See, e.g., Palmieri v. State of New York*, 779 F.2d 861, 864 (2d Cir.1985); *Martindell v. International Tel. & Tel. Corp.*, 594 F.2d 291, 293–94 (2d Cir.1979); *see also In re NASDAQ Market–Makers Antitrust Litigation*, 164 F.R.D. 346, 351 (S.D.N.Y.1996).

Rule 24(b), in relevant part, provides:

> Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and

the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

The Government and Defendants in this action do not seriously dispute that the Multidistrict Action shares questions of law and fact in common with the Government Action. The two complaints allege essentially the same conduct on the part of Nasdaq marketmakers, and both complaints assert that this conduct violated the Sherman Act.

However, the Government does contend that the specific issues to be determined in the Tunney Act proceeding are different from the issues in the Plaintiffs' action. The Government argues that the primary issue in the Tunney Act proceeding is whether the proposed consent decree is in the public interest, while the primary issue in the private action is whether Plaintiffs are entitled to damages.

This attempt to narrowly define the "main action" to mean only the Tunney Act proceeding inappropriately limits the court's discretion to permit intervention. Rule 24 permits intervention in the Government "action," not merely the Tunney Act proceeding. The "main action," within the meaning of the rule, is not the Tunney Act proceeding, but the entire Government action seeking to remedy alleged violations of the antitrust law. Therefore, the Plaintiffs have met the threshold condition for permissive intervention that there be common issues of law and fact between the two claims.

However, the Government and Defendants urge the Court to exercise its discretion and deny intervention based on the risk that intervention would "unduly delay or prejudice the adjudication of the rights of the original parties." They contend that most courts have denied intervention in similar circumstances because of the inevitability of delay when new parties are added. *See, e.g., United States v. International Business Machines Corp.*, No. 72–344, 1995 WL 366383, *5 (S.D.N.Y. June 19, 1995) ("*IBM*") (denying permissive intervention because, *inter alia,* potential for unwarranted delay outweighed any benefit from intervention). An intervenor, they contend, may have the right to file counterclaims and cross-claims, to depose witnesses and to appeal from orders of the Court. Any such action, they argue, would only delay entry of the Stipulation and would, as a result, delay the initiation of enforcement procedures, including taping and monitoring of telephone conversation.

Defendants and the Government also argue that the Tunney Act facilitates a consolidated Government response to all comments and that intervention would undermine the efficiency of such consolidated proceedings. The Tunney Act requires that such responses, together with the underlying comments, be filed with the Court. *See* 15 U.S.C. §§ 16(d), (f). The parties to this action urge that Plaintiffs' formal intervention would impose upon the Court and the DOJ the burdensome task of separately responding to and ruling on Plaintiffs' objections.

The possible delays imposed on the Court and the existing parties to this case by intervention are not unduly burdensome in light of the potential benefit of intervenors' vigorous litigation of the prospective protective order and the discoverability of the Settlement Memorandum. Significantly, this action provides the only forum in which to seek disclosure of the Settlement Memorandum (and appeal from the Court's decision thereon), since it will not be in the possession of parties to the Multidistrict action.

The proposed intervention in the *IBM* case, cited by the Government and the Defendants for the proposition that intervention should normally be denied in consent decree proceedings, would have required completely new discovery and the introduction of new evidence and legal issues into the case. 1995 WL 366383, *5. The *IBM* court distinguished *United States v. American Telephone and Telegraph Co.*, 552 F.Supp. at 218–19 (in which the court granted intervention in antitrust consent decree proceedings) on the grounds that the intervening parties in *AT & T* were limited to submission of comments, engaging in oral argument and filing appeals, not conducting discovery or

developing evidence. *IBM*, 1995 WL 366383 at *6.

Here, Plaintiffs are being permitted to intervene for two very limited purposes: (1) to make a concurrent motion to disclose a single document (along with the underlying depositions and documentary evidence expressly referred to therein) to which they do not have access in their private action, and (2) to raise an objection to a single provision of the proposed consent decree. Resolving the motion to compel disclosure of the Settlement Memorandum and underlying documents will not delay the proceedings any more than resolving the motion to intervene, since this opinion decides both motions simultaneously. The Plaintiffs' objections to the prospective non-disclosure provisions of the proposed decree raise purely legal questions that will not require additional discovery or evidence. As in *AT & T*, Plaintiffs here will be limited to submitting comments on the decree, engaging in oral argument, and filing appeals. Any delay incident to the additional argument required to decide this issue or to any appeal therefrom is not "undue" given the significance of the legal issues raised.

The Defendants' assertion that intervention will require this Court to address Plaintiffs' objections to the proposed Consent Decree separately from the objections raised by commentators from the public is unfounded. If the Government has not already responded to the specific objection raised by Plaintiffs in this motion, perhaps because no public comments addressed the issue, they may be required to make an additional submission. However, all parties have already prepared written argument on the issue. Any additional effort required will be minimal.

The Government and Defendants further contend that the interests of Plaintiffs can be protected adequately without intervention. They claim that Plaintiffs will be able to seek discovery of the Settlement Memorandum and underlying materials in the Multidistrict action. They argue further that there is no reason to permit Plaintiffs to submit their views to this Court as intervenors or *amici* when they have an opportunity to comment on the proposed order pursuant to the public comment provisions of the Tunney Act. *See*

*United States v. G. Heileman Brewing Co.*, 563 F.Supp. 642, 652 (D.Del.1983) ("[u]nder the APPA, courts have rejected requests for third party participation in the absence of a showing that the statute's comment procedure is inadequate for evaluation of a complainant's views"); *United States v. Carrols Development Corp.*, 454 F.Supp. 1215, 1221–22 (N.D.N.Y.1978) (denying request for *amicus* participation where "the purposes for granting such participation have already been achieved here since the moving parties have set forth their views in considerable detail ... in comments submitted to the Government under the APPA").

The Government and the Defendants urge that reliance on the Tunney Act's comment procedure, as opposed to intervention, would also be consistent with Congressional intent. They cite an interpretation of the legislative history contained in *Heileman Brewing:*

> Congress expected that the district court "would adduce the necessary information through the least complicated and least time-consuming means possible." ... Hence, the legislative history reveals that the main purpose of the bill was "to encourage additional comments and response by more adequate notice to the public" and not to invite intervention with all of the attendant problems, complexities, and delays that such participation would inevitably involve.... According to the bill's chief sponsor, Senator John Tunney, the [Tunney Act's] proponents did "not seek to open the floodgates to litigation, nor has anyone argued that the bill, in its final version and as it was endorsed by all members of the Judiciary Committee would do so."

*Id.* at 652–53 (citing S.Rep. No. 298, 93rd Cong., 1st Sess. 6–7 (1973); H.R.Rep. No. 1463, 93rd Cong., 2d Sess. 8 (1974), 1974 U.S.C.C.A.N. 6535; 119 Cong.Rec. 24598–24599 (1973) (remarks of Sen. Tunney); 120 Cong.Rec. 36343–36344 (*1974) (remarks of Rep. Jordan)).

While it may be true that some aspects of the legislative history suggest a preference for using the public comment mechanisms in §§ 16(b), (c) and (d), the statute expressly permits intervention, and some

courts have exercised their discretion to allow intervention. *See American Cyanamid,* 719 F.2d at 563; *AT & T,* 552 F.Supp. at 218–19. Here, intervention is appropriate because not all of the Plaintiffs' asserted interests can be protected through the public comment process. As the Government conceded at oral argument, Plaintiffs will be unable to compel production of the Settlement Memorandum in their private case, since Defendants are not in possession of the Memorandum. Moreover, if Plaintiffs' sole vehicle for seeking the Settlement Memorandum or objecting to the prospective nondisclosure provision is public comment, they would be unable, as non-parties, to appeal an adverse decision.[4]

Plaintiffs will be permitted to intervene for the limited purposes of making their motion to compel disclosure of the Settlement Memorandum (and underlying evidence referred to therein) and to raise objections to the prospective nondisclosure provisions of the consent decree.

## II. *The Government Will Not Be Compelled to Produce the Settlement Memorandum*

Plaintiffs advance two arguments for disclosure of the Settlement Memorandum and its underlying evidentiary materials. First, they argue that the Settlement Memorandum is a "determinative document," required to be disclosed under 15 U.S.C. § 16(b). Second, they argue that the Court should exercise its discretion to order production of the documents pursuant to 15 U.S.C. § 16(f)(3), which permits the court to "authorize ... examination of ... documentary materials."

## A. *The Settlement Memorandum is Not a "Determinative Document"*

■ The Tunney Act, 15 U.S.C. § 16(b), provides that "any other materials and documents which the United States considered determinative in formulating [a proposed consent decree], shall also be made available to the public at the district court." The government has claimed that there are no "determinative" documents or materials required to be submitted in this case.

Although the Government's determinations in prosecuting an antitrust case are entitled to considerable deference, *see Microsoft,* 56 F.3d at 1461, at least one court has decided that the Government's conclusion that there are no determinative documents is subject to independent judicial review, and that disclosure of documents the court deems determi-

---

**4.** Plaintiffs also contend that intervention in this action is necessary to challenge the non-disclosure provision, because if they wait to challenge the provision in a separate proceeding, the Defendants will argue that they were precluded from litigating an issue that could have been litigated during the consent decree proceedings. It seems unlikely that Plaintiffs would actually be barred from challenging the provision in later proceedings. If Plaintiffs were not permitted to intervene as parties in this action, they would not be bound by traditional principles of collateral estoppel. Under the collateral estoppel doctrine, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit involving *a party* to the prior litigation. *United States v. Mendoza,* 464 U.S. 154, 158, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984). Even so-called "non-mutual" collateral estoppel can only be asserted against parties (or privies of parties) to the prior action. *See id.* at 159 n. 4, 104 S.Ct. at 571 n. 4 (describing offensive and defensive non-mutual collateral estoppel). While the Supreme Court has indicated that an individual's failure to intervene in a prior proceeding could preclude that individual from making offensive use of a prior advantageous judgment, *Parklane Hosiery Co. v.*

*Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979), there is no reason that such a non-party would be bound by an adverse determination in a case to which it was not a party.

Further, it is not likely that Defendants could successfully argue in a later proceeding that Plaintiffs should be precluded from litigating the validity of the prospective non-disclosure provision of the decree because the Government represented Plaintiffs' interests in the prior action. In *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 689, 81 S.Ct. 1309, 1312–13, 6 L.Ed.2d 604 (1961), the Supreme Court denied a private parties' intervention in a government antitrust action on the grounds that "a person whose private interests coincide with the public interest in government antitrust litigation is nonetheless not bound by the eventuality of such litigation." Moreover, the entry of the consent decree is not an adjudication on the merits that can give rise to issue preclusion of the sort Plaintiffs fear. *See I.A.M. National Pension Fund v. Industrial Gear Mfg. Co.,* 723 F.2d 944, 949 & n. 7 (D.C.Cir.1983) (consent decree no basis for issue preclusion because no judicial determination of questions of law or fact).

native may be ordered. *See United States v. Central Contracting Co.,* 531 F.Supp. 133, 537 F.Supp. 571 (E.D.Va.1982).

Plaintiffs contend that the Settlement Memorandum and associated materials provided to Defendants in advance of filing and expressly referenced in the Settlement Memorandum were determinative documents and should be made public. They argue that the Settlement Memorandum is a determinative document because it contributed to the Defendants' decision to enter into a consent decree.

Plaintiffs rely primarily on the *Central Contracting* cases, in which the district court held that determinative documents are those "materials and documents that substantially contribute to the determination (by the government) to proceed by consent decree." 537 F.Supp. at 577. In applying this standard, the *Central Contracting* court compelled the Government to disclose a letter from one of the defendants in the case and a plea agreement in a prior criminal prosecution of the same defendant. *Id.* at 576–78. The letter related information concerning the defendant's financial circumstances and referred to terms on which the defendant would be willing to settle. The plea agreement apparently included a stipulation that the defendant would accept a civil consent decree very much like that proposed in the civil case before the *Central Contracting* court.

The Settlement Memorandum Plaintiffs seek is unlike the documents considered "determinative" by the *Central Contracting* court. The documents in *Central Contracting* were non-evidentiary documents prepared by sources external to the DOJ that did not relate directly to the strength of the Government's case on the merits, but nonetheless bore heavily on the Government's determination to proceed by consent decree and on the shape of the relief itself. Here, the Settlement Memorandum is a document related directly to the merits of the case and created internally by the DOJ. It has been represented that it organizes the Government's evidence and legal theory for the purpose of facilitating a consent decree, which the Government already believed would be in the public interest. It did not "determine" the Government's decision to enter into a consent decree or the shape of the proposed relief, any more than the individual elements of evidence it contained determined the relief. It was, instead, the result of the internal effort of DOJ to organize its evidence for the purpose of evaluating its case and presenting it to Defendants in settlement negotiations.

Moreover, *Central Contracting's* broad definition of "determinative documents" may conflict with Congress's intent to maintain the viability of consent decrees as a means of resolving antitrust cases. In enacting the Tunney Act, Congress recognized the "high rate of settlement in public antitrust cases" and wished to "encourage[ ] settlement by consent decrees as part of the legal policies expressed in the antitrust laws." H.R.Rep. 93–1463 at 6. It wanted to remedy abuses in the consent decree process by focussing judicial and public scrutiny on "the Justice Department's decision to enter into a proposal for a consent decree," *id.* at 7, but not at the expense of eliminating the decree as a practicable means of resolving antitrust matters. The purpose of the competitive impact statement, the public comment procedures, and the requirement that a defendant reveal lobbying contacts with the government (15 U.S.C. 16(g)), are "to enable a court to determine whether a proposed consent decree is in the 'public interest' " *id.* at 21, not to evaluate the strength of the Government's case.

■■■■ Plaintiffs' expansive interpretation of "determinative document" is inconsistent with the Tunney Act's limited purpose of ascertaining whether a proposed consent decree is within the scope of the public interest. Under the Tunney Act, "the court is only authorized to review the decree itself," and is "not empowered to review the actions or behavior of the Department of Justice." *Microsoft,* 56 F.3d at 1459. Moreover, the Government's judgments in a Tunney Act proceeding are entitled to deference. *Id.* at 1461.

The legislative history of the Tunney Act gives some support to a narrower reading of "determinative document" than that proposed by Plaintiffs. Congress enacted the

Tunney Act partly in response to consent decrees entered in three cases involving the International Telephone and Telegraph Corporation (ITT). These cases challenged three ITT acquisitions, including that of the Hartford Fire Insurance Company. The consent decrees permitted ITT to retain Hartford. Subsequent Congressional hearings revealed that the Antitrust Division had employed Richard J. Ramsden, a financial consultant, to prepare a report analyzing the economic consequences of ITT's possible divestiture of Hartford. Ramsden concluded that requiring ITT to divest Hartford would have adverse consequences on ITT and on the stock market generally. Based in part on the Ramsden Report, the Department concluded that the need for divestiture of Hartford was outweighed by the divestiture's projected adverse effects on the economy.

The Ramsden Report was cited by the Act's chief sponsor as exemplifying a "determinative document." During the Senate debate on the determinative documents provision, Senator Tunney expressly stated: "I am thinking here of the so-called Ramsden memorandum which was important in the ITT case." 119 Cong.Rec. 24,605 (1973).

Although "determinative documents" are not necessarily limited to recommendations prepared by outside consultants, the events that led Congress to enact the "determinative document" provisions support the conclusion that Congress was more concerned with exposing external influences on the consent decree process than it was with documents, such as the Settlement Memorandum, reflecting the Government's internal evaluation of its evidence, even when that internal evaluation is undertaken to persuade defendants to enter into a consent decree.

For the reasons set forth above, the Settlement Memorandum and the underlying materials will not be disclosed as determinative documents.

**B.** *Plaintiffs Will Not Be Permitted to Review the Settlement Memorandum Under 15 U.S.C. § 16(f)(3)*

▇ Plaintiffs also argue that the Court should order production of the Settlement Memorandum pursuant to 15 U.S.C. 16(e)(2)

and 16(f)(3). Section 16(e)(2) provides that, in making the Tunney Act public interest determination, the Court may consider "the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations ... including consideration of the public benefit, if any, to be derived from a determination of the issues at trial." Section 16(f)(3) provides that, in making the public interest determination, the Court may "authorize full or limited participation ... by interested persons ... including ... examination of witnesses or documentary materials, or participation ... as the court may deem appropriate."

Plaintiffs claim that, because they are "individuals alleging specific injury from the violations set forth in the complaint" within section 16(e)(2), they should be granted a right to "examination of documentary materials" under section 16(f).

While the Court may consider the interests of "individuals alleging specific injury from the violations set forth in the complaint," that consideration is limited to "the impact of entry of such judgment upon ... [those] individuals...." 15 U.S.C. 16(e)(2). Plaintiffs' primary asserted interests in obtaining the Settlement Memorandum are to facilitate their own discovery efforts and to assist the Court in determining whether the decree is in the public interest by allowing Plaintiffs to provide more detailed comments on the decree's effects.

Plaintiffs contend that it would be inefficient to require them to "reinvent the wheel" by duplicating the Government's investigation through private discovery. They also contend that they should have access to the Settlement Memorandum as a "road map" for their private case. However, the Tunney Act's purpose is to expose consent decrees to greater public scrutiny, not to facilitate discovery in private antitrust suits. *See SEC v. Everest Management Corp.,* 475 F.2d 1236, 1239 (2d Cir.1972) (intervention not aimed at assisting private plaintiffs who seek to avoid duplication of agency's investigative efforts).

Plaintiffs rely on a portion of the Tunney Act's legislative history that suggests that a court may conclude in particular cases that it

is appropriate to "condition approval of the consent decree on the Antitrust Division's making available information and evidence obtained by the government to potential, private plaintiffs which will assist in the prosecution of their claims." S.Rep. No. 93–298 at 6–7; *accord* H.R.Rep. No. 93–1463 at 8. However, had Congress intended that courts routinely condition their approval of consent decrees on such disclosure, it could have required that the Government make its evidentiary files public. Congress imposed no such requirement, and there is no compelling reason to require the sort of disclosure Plaintiffs seek in this case. Through normal discovery in their private action, Plaintiffs will have access to much of the raw evidence collected by the Government in this case, specifically the transcripts of the testimony of CID deponents employed by the Multidistrict defendants.

▇▇ In addition, Congress has strictly limited disclosure of materials obtained by the Government under the ACPA from Defendants and other targets of CID requests. *See In re NASDAQ Market–Makers Antitrust Litigation,* 929 F.Supp. at 726; 15 U.S.C. 1313(c)(3).[5] Although the Tunney Act was enacted after the ACPA's confidentiality provisions, the Act does not purport to invalidate them and make the Government's files open to broad disclosure.

Moreover, the information incorporated in the Settlement Memorandum appears to be protected from disclosure by a variety of statutory, contractual and common law confidentiality provisions and privileges. For example, information that the DOJ obtained from the SEC remains confidential. *See* 17 C.F.R. 230.122; 17 C.F.R. 240.0–4; 44 U.S.C. 3510(b); *Shell Oil Co. v. Department of Energy,* 477 F.Supp. 413, 420 (D.Del.1979)

("Data immune from disclosure in the hands of a federal agency acquiring data retains that protection in the hands of a receiving agency after an inter-agency transfer.").

Moreover, the Government assured all of those whose CID depositions or other confidential disclosures were to be included in the Memorandum that the information would be used for no purpose other than settlement negotiations. The Government further assured the parties that access to the Settlement Memorandum would be strictly limited to a few individuals, none of whom were permitted to keep or copy any part of that document. Each of the individuals to whom the Settlement Memorandum was disclosed agreed in writing to maintain strict confidentiality of the information. To compel public disclosure of such carefully controlled information simply because it was previously disclosed exclusively in connection with settlement efforts[6] could seriously compromise the ability of investigative agencies to reach settlements in multi-party proceedings.

Furthermore, much of the Settlement Memorandum is arguably protected by a number of other established privileges. The Settlement Memorandum appears to have served in part as an aid in reviewing and making a decision on the Government's enforcement options, and thus falls within the governmental deliberative process privilege. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150–52 & n. 19, 95 S.Ct. 1504, 1516–17 & n. 19, 44 L.Ed.2d 29 (1975); *Access Reports v. Dept. of Justice,* 926 F.2d 1192, 1196 (D.C.Cir.1991); *Weissman v. Fruchtman,* No. 83 Civ. 8958, 1986 WL 15669, at *13 (S.D.N.Y. Oct. 31, 1986) (quoting *Mobil Oil Corp. v. Dept. of Energy,* 102 F.R.D. 1, 5 (N.D.N.Y.1983)). Further, since the Settle-

---

**5.** This court ruled in the companion Multidistrict action that the CID materials (which are presumably referenced in the Settlement Memorandum) are not protected by a privilege that Defendants in that action may assert. *In re NASDAQ,* 929 F.Supp. at 725–26. However, this does not mean that the Government can be compelled to disclose the materials in this action, since 15 U.S.C. § 1313(c)(3) expressly prohibits the Government from disclosing such documents without permission from the targets. *Id.* at 725.

**6.** This Court notes with some dismay the fact that the existence, and perhaps some of the allegedly confidential contents, of the Settlement Memorandum were apparently shared with members of the press. *See, e.g.,* Scot J. Paltrow, "Nasdaq Dealers Mull Next Move in Light of U.S. Probe Evidence," *The Los Angeles Times,* June 7, 1996, at B4 (Washington Edition). However, since it is not possible to identify the parties responsible for this disclosure, the parties cannot be held to have waived the confidentiality of the documents.

ment Memorandum was prepared for the express purpose of negotiating a settlement, it is arguably protected by the pro-settlement policy embodied in Fed.R.Evid. 408, which renders statements made in the course of settlement negotiations inadmissible. *Cf. Bottaro v. Hatton Associates*, 96 F.R.D. 158, 159–60 (E.D.N.Y.1982) (denying discovery of settlement agreement, inadmissible in evidence under Fed.R.Evid. 408, in absence of particularized showing of likelihood that disclosure will lead to discovery of admissible evidence); *accord, e.g., Weissman v. Fruchtman*, 1986 WL 15669 at *20 (S.D.N.Y. Oct. 31, 1986). Finally, because the Settlement Memorandum is part of the Government's investigative files, it may be protected by the law enforcement investigative privilege while the investigation is still pending and for a "reasonable" time thereafter. *See Raphael v. Aetna Cas. and Sur. Co.*, 744 F.Supp. 71, 74 (S.D.N.Y.1990).

Plaintiffs argue that any privilege the Settlement Memorandum may have enjoyed was waived by the Government when it shared the Memorandum with adverse parties. *See Center for Auto Safety v. Dept. of Justice*, 576 F.Supp. 739, 747–49 (D.D.C.1983) (under Freedom of Information Act, arguably deliberative Government documents, once disclosed in negotiations with the defendants, were no longer protected by FOIA's "deliberative process" exception). However, in this case, unlike *Center for Auto Safety*, the disclosure of the protected document was expressly conditioned on the preservation of privileges and confidentiality.

In addition, routine disclosure of the materials Plaintiffs seek would deter future defendants from entering into negotiated settlements with the Government, and, perhaps, from cooperating in investigations that are likely to lead to such negotiations. *See United States v. American Telephone & Telegraph Co.*, 552 F.Supp. at 151 (rejecting position that would, "as a practical matter [eliminate the consent decree] as an antitrust enforcement tool, despite Congress' directive that it be preserved"). The cost to antitrust enforcement, particularly in an era of declining government resources, could be substantial. Most of the Government's civil antitrust cases are now settled rather than tried. If more cases are required to be litigated because the substance of settlement negotiations are discoverable, fewer of them can be brought.

Finally, Plaintiffs are not foreclosed from seeking discovery of the evidence underlying the Settlement Memorandum in their private litigation. Although they may not be able to obtain the "road map" the Memorandum itself would provide, they do have access to the information collected by the DOJ.[7]

With regard to Plaintiffs' assertion that disclosure is necessary to evaluate the adequacy of the proposed relief, the Court will be able to assess the provisions of the proposed order without giving Plaintiffs access to the Settlement Memorandum. The Competitive Impact Statement (the "CIS") gives the Plaintiffs, the Court, and the public detailed and specific information concerning the conduct uncovered by the DOJ in its investigation. While the CIS does not disclose specific names and dates and evidentiary details, such information is unnecessary to a meaningful evaluation of the decree. The CIS and the complaint provide sufficient information to enable the Court to determine whether the proposed order adequately remedies the violations uncovered and alleged, and thus whether entry of the proposed order is within the "reaches of the public interest." *See Microsoft*, 56 F.3d at 1460 (court must look exclusively to allegations in complaint to determine whether remedies provided are adequate).

Plaintiffs argue that the Settlement Memorandum and underlying evidence should be disclosed because of the possibility that telephone monitoring will be inadequate to remedy the alleged collusion of the Defendants, since Defendants could disseminate and enforce the allegedly illegal quoting convention through other means of communication. Such conjecture does not constitute an adequate basis for granting Plaintiffs broad ac-

---

7. Indeed, in an opinion issued today in the companion Multidistrict Action, this Court grants Plaintiffs' motion for discovery of the CID deposition transcripts in the control of the Multidistrict Defendants.

cess to the Government's files. First, the CIS gives sufficient detail about the way in which the conspiracy has operated to obviate the need for reviewing the Settlement Memorandum. Moreover, Plaintiffs do not need to examine the Settlement Memorandum to make their argument that audio-taping of telephone conversations cannot guarantee that Defendants will not fix prices through other means.

Plaintiffs also argue that the Court needs a full evidentiary record to evaluate the adequacy of the decree, because it fails to impose on Defendants certain "quoting rules" proposed by the SEC. The CIS explains the DOJ's reasons for not insisting that the Defendant implement those rules as a condition of settlement. These reasons include the complexity involved in requiring less than all industry participants to implement the rules, fairness concerns and the pendency of the rules before the SEC. Moreover, since the Government's complaint was filed, the SEC has enacted the "quoting rules" that the DOJ supported (*see* 61 Fed.Reg. 48,290 (Sept. 12, 1996)), thereby mooting this issue.

### III. *The Court Will Consider the Plaintiffs' Objections to the Consent Decree In Making Its Public Interest Determination*

Under the terms of the proposed consent decree, the Defendants will tape record and monitor not less than 3.5 percent of their Nasdaq trader telephone conversations (up to a maximum of 70 hours per week). Section IV(C)(6) of the consent decree contains a protective order providing that tapes made pursuant to the decree are neither discoverable nor admissible in private civil actions.

Although the Court reserves decision until the time at which it makes its final public interest determination pursuant to the Tunney Act, the proposed prospective "protective order" raises serious concerns about the extent to which parties may use the consent decree as a mechanism to cloak evidence that would ordinarily be accessible to future litigants. *See Olympic Refining Company v. Carter,* 332 F.2d 260, 265 (9th Cir.1964) ("[A] consenting defendant in a Government antitrust suit gains whatever benefit there may

be in accepting the terms of the consent decree rather than risking a more onerous decree entered after litigation. A consenting defendant also benefits from the saving in litigation expense which is made possible by a consent decree. But neither in the express nor implied terms of the statutes or rules is there any indication that a consenting defendant could gain the additional benefit of holding under seal, or stricture of nondisclosure, for an indefinite time, information which would otherwise be available to the public or at least to other litigants who had need of it").

The parties will be permitted to file supplemental briefs on the legal permissibility and the policy implications of this prospective protective order. The Court will consider these briefs in the context of other materials made available to it in the course of the Tunney Act proceedings.

### Conclusion

For the reasons set forth above, Plaintiffs' motion to intervene in this action is hereby granted for the limited purposes of moving to compel disclosure of the Settlement Memorandum (and materials referenced therein), objecting to the prospective protective order in the proposed consent decree, and appealing from the decisions of this Court upon these issues. The Plaintiffs' motion to compel disclosure of the Settlement Memorandum and underlying materials is hereby denied. The parties are hereby granted leave to file supplemental briefs on the issue of the prospective protective order.

It is so ordered.