**UNITED STATES of America, Plaintiff,**

v.

**ASARCO INCORPORATED; Government Gulch Mining Company, Inc.; Hecla Mining Company, Inc.; Sunshine Mining Company, Inc.; Sunshine Precious Metals, Inc.; Coeur d' Alene Mines Corporation; and Callahan Mining Corporation, Defendants.**

**And Consolidated Case.**

**Nos. CV 96–0122–N–EJL, CV 91–342–N–EJL.**

United States District Court, D. Idaho.

Sept. 30, 1998.

Celeste K. Miller, Asst. U.S. Atty., Boise, ID, David F. Askman, U.S. Dept. of Justice, Washington, DC, Lois J. Schiffer, U.S. Dept. of justice, Land & Natural Resources Div., Washington, DC, thomas W. Swegel, Tom C. Clark, II, U.S. Dept of Justice, Washington, DC, Peter R. Mounsey, David F. Askman, U.S. Dept of Justice, Environmental Enforcement Section, Denver, CO, Elizabeth L. Loeb, Hilary C. Tompkins, Joan S. Carter, U.S. Dept of Justice, Environmental Enforcement Section, Washington, DC, Mark A. Nitczynski, U.S. Dept of Justice, Environmental & Natural Resources Div., Denver, CO, for U.S.

Raymond C. Givens, Givens & Funke, Coeur d'Alene, ID, William C. Harrison, Spokane, WA, Brian J. Cleary, Givens & Funke, Coeur d' Alene, ID, John W. Phillips, Michael R. thorp, Heller Ehrman White & McAuliffe, Seattle, WA, M. Michael Sasser, Hamlin & Sasser, Boise, ID, Peter J. Nickles, Joanne

B. Grossman, Allan B. Moore, Covington & Burling, Washington, DC, for Coeur d' Alene Tribe of Idaho.

John W. Phillips, Michael R. thorp, Heller Ehrman White & McAuliffe, Seattle, WA, M. Michael Sasser, Hamlin & Sasser, Boise, ID, Peter J. Nickles, Joanne B. Grossman, Allan B. Moore, Covington & Burling, Washington, DC, for Government Gulch Min. Co., Inc. and Federal Min. and Smelting, Inc.

Albert P. Parker, Hawley Troxell Ennis & Hawley, Boise, ID, Elizabeth H. Temkin, Kristin Tita, Ballard Spahr Andrews & Ingersoll, Denver, CO, for Hecla Min. Co.

Bruce C. Jones, Paul J. Augustine, Evans Keane, Boise, ID, Fred M. Gibler, Charles L.A. Cox, Evans Keane Koontz Boyd Simko & Ripley, Kellogg, ID, for Sunshine Min. Co. and Sunshine Precious Metals, Inc.

Eugene I. Annis, Lukins & Annis, Spokane, WA, William F. Boyd, Coeur d' Alene, ID, for Coeur d' Alene Mines Corp.

William F. Boyd, Coeur d' Alene, ID, for Callahan Min. Corp.

### ORDER

LODGE, Chief Judge.

Pending before the Court in the above-entitled matter are numerous motions. The Court heard oral argument on the motions for summary judgment on June 12, 1998, and is now prepared to rule upon the statute of limitations and related motions.

### 1. *Motions to Strike References to Inadvertently Produced Privileged Document and to Return Privileged EPA Memorandum*

United States Trustee (USA) moves the Court to strike all references to a privileged document cited by all Defendants (Hecla's Exhibit No. 140) which was inadvertently produced during discovery. The March 20, 1996 document entitled "Bunker Hill Heads Up" has been reviewed by the Court. It is clear based on the content of the letter taken as a whole that the letter was drafted by an attorney. Additionally, USA counsel, as a officer of the court, has represented that this document was drafted by an EPA attorney

and was inadvertently produced. Accordingly, the Court finds that the document is attorney work product and is privileged correspondence. The Court will grant the motion to strike based on the Protective Order issued by this Court on February 10, 1997. The document has been widely distributed and it would serve no purpose to have copies of the document returned at this stage in the litigation, so the motion to return will be denied. However, the parties shall not reference this memorandum in any future discovery or pleadings.

### 2. *Motions to Strike Testimony of Randall Smith*

The Defendants seek to have certain testimony of Randall F. Smith stricken. Mr. Smith's testimony relates to interpreting written documentation regarding EPA's interpretation of the boundaries of the Bunker Hill Superfund Site. Mr. Smith has been an employee of the EPA since 1980, however, he was not directly involved in drafting the documentation at issue in this case and appears to only be offering his opinion of what was really meant by the EPA officials who drafted the documentation at issue. Mr. Smith became the Director of Environmental Cleanup Office for Region 10 in September of 1995.

The Court agrees with the Defendants that Mr. Smith's testimony interpreting EPA's documentation is not proper. It is for the Court to interpret the exhibits provided by the parties unless the party who drafted the exhibit has been deposed and can provide an explanation from personal knowledge. Mr. Smith lacks personal knowledge of the specific exhibits even though he was employed by the EPA since 1980. His general knowledge of the Site does not support a finding of competency to testify as to the intention of another EPA official who drafted the exhibits and who did not work directly with Mr. Smith when such exhibits were drafted. As to any exhibits after September of 1995, Mr. Smith would be qualified to testify regarding the EPA interpretation since his employment duties directly involve the Site. The motion to strike is granted to the extent Mr. Smith is offering his opinion on documents and

EPA policy regarding the Site prior to September 1995.

### 3. *Cross Motions for Summary Judgment on the Scope of the NPL Facility*

#### a. *Issue*

Defendants claim that for purposes of the NRD claims by the USA, such claims must be restricted to the 21 square mile Bunker Hill area referred to as the 'Box' based on the argument that the claims on the area outside the Box are not timely filed. USA argues that the NRD claims are not limited to the 'Box,' but include the entire Coeur d'Alene Basin and possibly more area as such affected areas are discovered and all claims are timely filed as being part of or 'with respect to' the Bunker Hill NPL listing.

#### b. *Standard of Review*

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the non-moving party fails to make such a showing on any essential element, "there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Id.* 477 U.S. at 323, 106 S.Ct. 2548.[1]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975) (*quoting First Nat. Bank of Ariz. v. Cities Service Co. Inc.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The Ninth Circuit cases are in accord. *See, e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371 (9th Cir. 1989).

> According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* 882 F.2d at 374 (citation omitted).

Of course, when applying the above standard, the court must view all of the evidence in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hughes v. United States,* 953 F.2d 531, 541 (9th Cir.1992).

In this particular case, the Court acknowledges that there are facts in dispute regarding whether or not the scope of the NRD

---

1. *See also,* Rule 56(e) which provides, in part:
> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by

affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

claim is limited to the Box or the Basin. However, the Court finds that disputed facts are not based upon issues of credibility of witnesses, but instead are based upon interpretations of the written exhibits which speak for themselves. The disputed facts arise when the parties argue what the documents mean, not from the documents themselves. Moreover, both parties agree that the issue is ripe for determination by the Court. Finally, since the parties are not seeking a jury trial on the issues, this Court will ultimately have to decide the issue and the Court has determined that it should decide the legal issue regarding the statute of limitations on the record before the Court.

### c. *Factual Background*

The United States Environmental Protection Agency (EPA) knew early on that the actions of the mining companies as well as others were affecting the Coeur d'Alene Basin (Basin). Studies in the 1920s and 1930s indicated that animals and fish were being harmed by the releases of hazardous substances due to mining activities.[2] On September 8, 1983, the EPA listed the Bunker Hill Mining Site (the Site)[3] on the NPL pursuant to CERCLA. The decision to list the Site was based on a Hazard Ranking System (HRS) analysis. The HRS does include some identification of hazardous releases upstream and downstream of the Box. In December of 1983, the State of Idaho (State) filed an action to recover mining-related NRD for resources in the vicinity of the South Fork of the Coeur d'Alene River pursuant to CERCLA. The EPA did not join this lawsuit. In December of 1984, EPA and the State agreed that the initial boundaries

of the NPL listed Site equaled the Box. The main reason for setting the initial boundaries to be the Box were the potential human health problems and concerns in the populated area around the Bunker Hill Mining Complex. The EPA's initial boundaries for the Site directly correspond to the boundaries in a 1983 Lead Health Study of the Bunker Hill area.

Due to the complexity of the environmental problems associated with the Site, EPA exercised its discretion to conduct a Remedial Investigation/Feasibility Study (RI/FS) on the 21 mile area designated in the NPL site. The EPA stated in 1984 that the NPL site boundaries might need to be expanded based upon data obtained during a Remedial Investigation/Feasibility Study (RI/FS). The RI/FS was divided into two parts: analysis of populated areas and analysis of non-populated areas. In August 1991, the Record of Decision (1991 ROD) on the populated areas of the Box was completed. In September of 1992, a second ROD (1992 ROD) on the non-populated areas of the Box was completed. It is undisputed that the RODs made mention of the fact that upstream sources of hazardous substances existed and such hazardous substances have become located within the Site and which are also being released from the Site to areas downstream. However, the RODs also specifically limited themselves to a 'site' defined as the Box and which corresponded exactly to the site listed on the NPL.[4]

Based upon correspondence from the EPA from the listing on the Bunker Hill Site until after the 1991 ROD and 1992 ROD were issued, the EPA did not expand the boundaries of the Site beyond the Box. Nor did

2. *See,* United States' May 1998 Supplemental Response to Asarco's First Set of Interrogatories provided by counsel for Asarco during oral argument on June 12, 1998. These studies were discovered by the EPA at least by the time the Preliminary Natural Resource Survey (PNRS) was signed on June 12, 1986.

3. The Bunker Hill Mining Site is an approximately 21 square mile area located entirely in Idaho's Shoshone County along the South Fork of the Coeur D'Alene River. This is the area referred to as the Box and has also been referred to as the Bunker Hill Mining and Metallurgical Complex, The Bunker Hill Mining and Smelter

Complex, the Bunker Hill Superfund Site, or simply the Bunker Hill Complex.

4. The 1991 ROD defines the site as 'the cities of Kellogg, Smelterville, Wardner, Pinehurst and other residential areas within the site'. All cities listed are located within the Box. The 1992 ROD states the EPA and Idaho Department of Health and Welfare 'have designated a 21-mile study area as the Site for purposes of conducting the Remedial Investigation/Feasibility Study....' (p. 1–1.) 'The Site (as defined in the 1992 ROD) was placed on the National Priorities List (NPL) in September of 1983 (48 FR 40658).' (p. 2–6.)

the EPA take formal steps to modify the boundaries of the Site for purposes of the NPL after the RODs were issued.

In July of 1991, the Tribe filed its action to recover NRD for resources in the Basin pursuant to CERCLA. USA was aware of the Tribe's request for the United States as Trustee to file the NRD action on the Basin, but USA did not file the action and did not join the Tribe's action. On March 19, 1992, the United States Department of Justice (DOJ) acting at the request of the Federal Trustees sought leave to file an *amicus curiae* brief in the Tribe's NRD action. In the brief, the Federal Trustees argued that the Bunker Hill facility included, but was not limited to, the 21 square mile Bunker Hill Superfund Site and implied that the 'NPL facility' for purposes of the statutory language of CERCLA's statute of limitations included the Coeur d'Alene Basin both upstream and downstream of the Box. In response to the Tribe informing the EPA of the Federal Trustee's position, the EPA Regional Administrator Rasmussen responded by letter on May 14, 1992:

> I believe that it is useful to restate EPA's intentions for cleanup activities in these areas [downstream of the Box] at this time. EPA has consistently stated it intention to pursue the full extent of CERCLA authorities with the 21 square mile area addressed by the ... Bunker Hill Superfund RI/FS efforts... The agency has also consistently stated its intention to work with the Tribe, and with other federal and state regulatory agencies, to utilize CERCLA and other statutes to address contamination in areas of the Coeur d'Alene River Basin beyond the 21 square mile

Bunker Hill area through the Coeur d'Alene Restoration Project.[5]

Based upon numerous letters and other correspondence from the EPA, it is clear that the agency with the authority to broaden the boundaries of a site listed on the NPL elected not to broaden the Site's boundaries. EPA's position was that cleanup outside the Box would be handled through the Coeur d'Alene Basin Restoration Project and not through an expansion of the boundaries of the Site listed on the NPL. Regional Administrator Rasmussen stated on November 24, 1992 that the EPA had completed the two RODs for the Bunker Hill Site and that neither of these RODs (the 1991 ROD and the 1992 ROD) addressed the contamination in the remainder of the Basin, including the South Fork of the Coeur d'Alene River.[6] Rasmussen stated that two completed RODs support the Remedial Design/Remedial Action selected by the EPA for the Box and to be discussed in negotiations for a consent decree. Again, the EPA states that for the area outside the Box, the EPA will coordinate with the Coeur d'Alene Basin Restoration Project to clean up these areas using 'a variety of authorities to address the contamination in these areas [in the Basin, but outside the Box].'

Additionally, in every administrative proceeding concerning the Bunker Hill Superfund Site, the EPA consistently maintained that the hazardous substances site for purposes of the NPL listing was only the Box.[7]

As of August 1997, the Superfund EPA National Priorities List on the Internet includes a 'Site Description' which indicates that NPL site is limited to the 21 square mile

---

**5.** Hecla Exhibit No. 83.

**6.** In November 24, 1992 correspondence from the EPA, the EPA notes in part:

> As you are aware neither of these RODs [1991 and 1992] addresses contamination in the remainder of the Basin, including the South Fork of the Coeur d'Alene River. EPA intends to use the a variety of authorities to address contamination in these areas.
> ... These actions [the Basin cleanup] will be coordinated with the broader objectives of the Coeur d'Alene Basin Restoration Project. The Basin Project is expected to utilize a variety of

authorities and programs, in addition to CERCLA, to achieve the goal of improving environmental quality in the Coeur d'Alene Basin.
Hecla Exhibit No. 98.

**7.** For example, *In Gulf Resources and Chemical Corp.*, EPA Docket No. 1085–09–09–104; *United States v. Bunker Limited Partnership;* Civil Case No. 90–244–N–HLR; *In Re: Von Roll Transportation Systems, Inc., et al.,* under authority of CERCLA, No. 1098–07–01–122; *Mehl v. EPA,* Civ. No. 90–1377 (U.S.D.C.D.C.); *Coeur d'Alene Tribe v. Gulf Resources and Chemical Corp.,* Civil Case No. 91–342–N–HLR (U.S.D.C.Idaho).

Box.[8] The EPA's 'Explanation of Significant Differences for Revised Remedial Action at the Bunker Hill Superfund Site' dated April of 1998 limits the Superfund site to the Box.[9] In fact, the first date that EPA publicly acknowledged that the Site listed on the NPL is broader than the 21–mile square area was in May of 1998. On May 5, 1998, the EPA issued a News Release which stated that the EPA had been working with a number of different entities 'to create a profile of the Basin's land and water quality.'[10] The news release indicated that in order to compile all the reports together and fill any gaps, the EPA is conducting a RI/FS under Superfund authority.[11] Finally, the news release concludes with some self-serving statements attempting to resolve the motion for summary judgment pending before this Court:

> EPA is conducting the RI/FS to comprehensively determine the extent of contamination existing with the Bunker Hill Facility, which was placed on the Superfund National Priorities List (NPL) by EPA in 1983. . . . In reality, when Bunker Hill was named a Superfund site in 1983, EPA made clear that the site would include areas—both upstream and downstream—that are contaminated with mining wastes. Our studies now underway in the Basin will determine exactly where those areas are that need special attention, treatment, removal or capping.

d. *The NPL Process*

The EPA is charged with preparing a National Contingency Plan (NCP) for remediating hazardous substance releases and to create a list of priority sites where releases have occurred. The list of priority sites is the NPL. After EPA proposes a site to be included on the NPL, interested parties have sixty days to file comments or objections to the proposed listing. Parties with standing must file challenges within ninety days of the date of the formal listing or risk waiving the challenge.

The EPA must update the NPL annually through informal rulemakings. 42 U.S.C. § 9605(a)(8). On September 8, 1983, EPA promulgated the original NPL which included as one of the 406 sites, the Bunker Hill Superfund Site. A listing on the NPL begins the formal process of remediation under CERCLA. The remediation phases include the RI/FS which defines the extent of the contamination and explores remediation alternatives; a ROD that selects and describes the remediation alternative selected; and the Remedial Design/Remedial Action (RD/RA) which involves actual performance of the remediation plan.

It is important to note that a listing on the NPL is not a prerequisite to a CERCLA enforcement action. As stated by the court in *Montrose Chemical Corp. of California v. Environmental Protection Agency*, 132 F.3d 90, 92, fn. 3 (D.C.Cir.1998), the EPA may take 'response actions' at hazardous waste sites regardless of whether a site is listed on the NPL. There are two types of 'response actions' under CERCLA: removal actions and remedial actions. 'Removal actions' are a broad range of monitoring, investigative, and cleanup activities 'as may be necessary to prevent, minimize, or mitigate damage'[12] and may include remedial planning activities and RI/FSs.[13] Remedial actions are more comprehensive actions that are intended as permanent remedies.[14] Even though the EPA may conduct 'response actions' at any site, the EPA may only take 'remedial ac-

---

**8.** Hecla Exhibit 127.

**9.** Hecla Exhibit 146.

**10.** Hecla Exhibit No. 144.

**11.** Apparently this authority is EPA's authority to conduct a response action on any site and a response action can include a removal action which by regulatory definition can include a RI/FS. 40 C.F.R. § 300.425(b)(1).

**12.** 42 U.S.C. § 9610(23).

**13.** 40 C.F.R. § 300.425(b)(1).

**14.** CERCLA defines 'remedial action' as 'those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.' *See,* 42 U.S.C. § 9601(24).

tions' at sites listed on the NPL. *Id.* and 40 C.F.R. § 300.425(b)(1).

The NCP sets forth HRS as the primary method for placing a site on the NPL.[15] The HRS evaluates the relative site risks posed to human health or the environment. If a site is assigned a score of 28.5 or more, EPA will propose the site for inclusion on the NPL. 55 Fed.Reg. at 51,569.

■ While it is true that the EPA may expand the boundaries of a NPL site without notice or formal rulemaking, such expansion must be reasonably anticipated to be within the original designation of the site. In *Washington State Department of Transportation v. U.S. Environmental Protection Agency,* 917 F.2d 1309 (D.C.Cir.1990), the court held that in the case of a NPL site without any exact geographic boundaries, the area being challenged as not included was within the broad compass of the notice provided by the initial NPL listing. In *Washington State Department of Transportation,* the court held that the land at issue was 500 feet from Tacoma's City Waterway which was a short inlet off Commencement Bay and that the initial NPL description was the 'Tideflats industrial area', a stretch of Commencement Bay. Citing *Eagle–Picher Industries v. United States Environmental Protection Agency,* 822 F.2d 132 (D.C.Cir. 1987), the *Washington State Department of Transportation* court restated its holding that 'the EPA may alter or expand the boundaries of a NPL site if subsequent study reveals a wider-than-expected scope of contamination.' *Id.* 917 F.2d at 1311. In *Eagle–Picher* the EPA expanded the NPL site from 15 square miles to 115 miles as the EPA discovered the full extent of contamination.

e. *Analysis.*

As admitted by the Defendants, hazardous substance releases due to historical mining activities are not limited to the Box. Haz-

ardous substances have been identified upstream and downstream from the Box. However, the issue before this Court is whether the area outside the Box is included as part of the NPL listed Bunker Hill Superfund Site in order for the NRD action to be timely filed under the special statute of limitations provided in 42 U.S.C. § 9613(g).

The USA makes three arguments that the Basin is included within the NPL for the Bunker Hill Superfund Site. First, the data to support the NPL listing of the Site included in the HRS of 1982 indicates that the hazardous substances were outside the Box and that the Site was not limited to just the Box. Second, the Basin is included by CERCLA's broad definition of 'facility' as hazardous substances have otherwise come to be located in the Basin. Third, the Basin is 'with respect to' the facility listed on the NPL and is therefore, covered by the special statute of limitations. The Court will address each of these statutory arguments.

(1) *What does the HRS say about the Basin?*

■ The Court has reviewed the HRS documents provided by both the Defendants and USA. The Court finds that the HRS does make some mention of the upstream and downstream flow of contamination, but the HRS does not score the geographical area outside the Box. The cover sheet to the HRS indicates that lead contamination study of the Box was the primary documentation for the HRS that justified an NPL listing. Additionally, the Court finds that it is the EPA's site description of the boundaries of the NPL facility which is most critical in determining what is included in the NPL listed facility. The studies [16] that followed on the heels of the HRS all limited their scope to the Box. Therefore, the HRS does not support that the NPL listed facility is the entire Basin.

---

**15.** The other two methods of designation on the NPL are: 1) a state or territory can designate one priority site, regardless of its HRS score and 2) a site may be listed if the Agency for Toxic Substances and Disease Registry (ATSDR) has issued a health advisory that recommends removing people from the site; EPA determines that the site poses a significant threat to public

health; and EPA anticipates it will be more cost effective to use its remedial authority than to use its emergency removal authority to respond to the release. 40 C.F.R. § 300.425(c).

**16.** These reports included the RI/FS which was divided into the 1991 ROD and the 1992 ROD.

*(2) Statutory Construction of the Special Statute of Limitations*

It is undisputed by the parties that CERCLA's general statute of limitations has expired and in order for the USA's NRD action to be considered timely filed the action must fall under the special statute of limitations included in 42 U.S.C. § 9613(g) which provides in part:

> **Period in which action may be brought.**
> (1) Actions for natural resource damages. Except as provided in paragraphs (3) and (4), no action may be commenced for damages ... unless that action is commenced within 3 years after the later of the following:
> (A) The date of the discovery of the loss and its connection with the release in question.
> (B) The date on which regulations are promulgated under section 301(c)..
> *With respect to any facility listed on the National Priorities List (NPL),* any Federal facility identified under section 120 [42 sc. 9620] (relating to Federal facilities), *or any vessel or facility at which a remedial action under this Act is otherwise scheduled,* an action for damages under this Act must be commenced within 3 years after the completion of the remedial action (excluding operation and maintenance activities) in lieu of the date referred to in subparagraph (A) or (B). *In no event may an action for damages under this Act with respect to such a vessel or facility be commenced* (I) prior to 60 days after the Federal or State natural resource trustee provides to the President and the potentially responsible party a notice of intent to file suit, *or (ii) before selection of the remedial if the President is diligently proceeding with a remedial investigation and feasibility study under section 104(b) or section 120 [42 U.S.C. §§ 9604(b) or 9620] (relating to Federal facilities).* The limitation in the preceding sentence on commencing an action before giving notice or before

selection of the remedial action does not apply to actions filed on or before the enactment of the Superfund Amendments and Reauthorization Act of 1986 [enacted Oct. 17, 1986].

(Emphasis added.)

In *California v. Montrose Chemical Corporation of California,* 104 F.3d 1507, 1513 (9th Cir.1997), the Court restated the governing principles for construing statutes:

> To begin, [i]n construing statutes in a case of first impression, we first look to the language of the controlling statutes, and second to legislative history. (citations omitted). '[I]f the language of a statute is clear and there is no ambiguity, then there is no need to 'interpret' the language by resorting to the legislative history or other extrinsic aids.' (citations omitted). Moreover, '[absent a clearly expressed legislative intent to the contrary, the plain language must ordinarily be regarded as conclusive].' (citation omitted). Lastly, statutes of limitation are to be strictly construed in favor of the government. (citation omitted).

Other applicable rules of statutory construction are that 'when interpreting a statue, the court shall strive to give effect to the legislative purpose in enacting the statute' [17] and an exception to these general rules may exist if a 'plain reading' leads to absurd results.[18]

The court in *Montrose* held that the language of sections 9613(g)(1)(B) and 9651(c) was not ambiguous. Now, this Court in this case of first impression finds that the language creating a special statute of limitations is not ambiguous. In dissecting the special statute of limitations, the Court finds that there are three ways to fall under the special statute of limitations: 1) the facility is listed on the NPL; 2) the facility is a Federal facility as defined by 42 U.S.C. § 9620; [19] or 3) the facility is a facility at which remedial action under CERCLA is otherwise scheduled. If a release falls under one of the

17. *See,* Jeffery G. Miller and Craig N. Johnston, *The Law of Hazardous Waste Disposal and Remediation* (1996) at 125.

18. *See, Aponte v. Gomez,* 993 F.2d 705, 708 (9th Cir.1993).

19. It is not disputed that the area at issue in this case is not a federal facility.

above three methods, then the trustee must file the NRD action within 3 years of the completion of the remedial action. Also, the trustee cannot file the NRD action until: 1) the potentially responsible party is sent a notice of intent to file suit, or 2) before selection of the remedial action if a remedial investigation and feasibility study (RI/FS) is diligently proceeding.

It appears to the Court that the USA is claiming the NRD action regarding the Basin falls under the first method of the special statute of limitations (i.e. facility listed on the NPL). Although a RI/FS has been initiated for the Basin, no 'remedial action' as defined by CERCLA is 'otherwise scheduled.'[20] In the deposition of Mr. Earl T. Liverman, III, of the EPA testified at his deposition on April 1, 1997, the EPA had no clean up scheduled for the area of the Basin below the Box.[21] In the deposition of Mr. Randall Smith of the EPA on April 2, 1997, Mr. Smith testified that the EPA had not selected a remedial action for outside the Box. Mr. Smith also stated that the 1992 ROD did not select a remedial action for the contaminated portion of the Basin outside the Box.[22] Since the EPA may only undertake remedial actions on sites listed on the NPL, there would be no need to have this third method available to the EPA.[23]

■ In applying a plain reading of the statute, the Court finds that there is an open-ended statute of limitations for any facility listed on the NPL. The Court can determine no statutory or regulatory time limit on how long (after the discovery of the loss to the natural resource and its connection to a release) the EPA has to determine that a site should be listed on the NPL. If the trustee fails to file a NRD action within 3 years of the date of the discovery of the loss and its connection with the release in question under 42 U.S.C. § 9613(g)(A), then the trustee can still timely file a NRD action for the loss if the facility is listed by the EPA on the NPL (which is updated annually and which would require a HRS score of 28.5 or higher). For example, if the loss and connection with a release was discovered 5 years ago and the EPA failed to file the NRD action within general statute of limitation of 3 years under § 9613(g)(1)(A), the EPA could list the site on the NPL at any time and start a new statute of limitations within 3 years from the completion of the remedial action. This example assumes the site would be serious enough to score the requisite HRS score to be listed on the NPL.

Does this reading of the statute lead to absurd results? The Court finds that this interpretation is consistent with the requirement to construe the statute in favor of the government and consistent with the legislative purpose of the statute. CERCLA was enacted to clean up hazardous substances which may endanger public health or environment and to hold those responsible for releases liable for the damage. The open-ended statute of limitations is consistent with the nature and number of potential NPL sites. The nature of a NPL site is that they require long-term investigation. The EPA could never be adequately staffed to determine all NPL sites within three years of the discovery of a loss and its connection with a hazardous substance release. The EPA needs time to evaluate sites, determine if they should be listed on the NPL and complete the remedial action before a statute of limitations should expire. Moreover, because NPL sites involve the risk of danger to human health and/or the environment, the EPA will list NPL sites as soon as possible in order to reduce or eliminate the risks such a site poses. Therefore, it would not be in the public's interest to delay listing a site on the

---

**20.** The Court acknowledges the EPA has started a RI/FS on the Basin, but it is appears from the regulatory language of CERCLA that a RI/FS is a 'removal action' and not a 'remedial action' as defined by CERCLA. 40 C.F.R. § 300.425(b).

**21.** Hecla Exhibit 122.

**22.** Hecla Exhibit No. 123.

**23.** In attempting to interpret this portion of CERCLA, the Court tried to determine a scenario in which the third method (facility at which a remedial action is otherwise scheduled) would apply. The only possibilities the Court could come up with are facilities that are not listed on the NPL where a state is handling the remediation, a RCRA action or a section 106 action where the EPA is not listing the site on the NPL as the PRP is handling the remediation.

NPL any longer than necessary to complete the investigation of the site. Moreover, for the same health and safety reasons, the site may be listed before the connection to a particular release is determined in order to protect the public and the environment. For these reasons, the Court finds that the resulting open-ended statute of limitations for facilities listed on the NPL is not an absurd result.

Hecla argues that the phrase 'at which a remedial action under this Act is otherwise scheduled' applies to all three methods and that a remedial action must be scheduled at a facility listed on the NPL in order to qualify for the special statute of limitations. The Court respectfully disagrees with this proposed construction of the statute. In reading the plain language of the statute, it appears to the Court that the phrase is modifying only the third way to get the special statute of limitations. If Congress had meant for the phrase to modify all three methods, a comma would have been added after the phrase 'vessel or facility.'

As stated earlier listing a site on the NPL generally means the site will require long term investigation and clean up. Since the EPA can only take 'remedial action' on a facility listed on the NPL, to require the remedial action to be 'otherwise' scheduled at the time the NRD action is filed ignores the reality of how long investigation of a NPL site can take before the remedial action is selected and the fact that the statute encourages the NRD action not to be filed until the remedial action is selected.

(3) *Is the Basin Included in the 'Facility Listed on the NPL'?*

■ 'Facility' is broadly defined by CERCLA to mean 'any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.' 42 U.S.C. § 9601(9). USA argues that in applying the special statute of limitations, the Court must apply the broad definition of the term 'facility' and this would result in the Basin being included under the statute of limitations. The Court respectfully disagrees with this analysis. The term facility includes any 'site' where the hazardous waste has come to be located.

The EPA has consistently defined the 'site' listed on the NPL to be the Box and has not extended the boundaries of the site to the Basin in accordance with regulatory requirements. The statute specifically limits the facilities or sites qualifying for the extended statute of limitations not to all facilities or sites, but only to those facilities or sites where hazardous substances have come to be located that are 'listed' on the NPL.

USA seeks to have the Court interpret both the statute of limitations as never-ending as well as the scope of what is a 'listed' facility. The Court declines to take such a position. First, anytime contamination involves water, the potential 'facilities' related to the release are unknown and extensive, but at some point the EPA has to draw a line on what the EPA considers the NPL facility to be. In the present case, the EPA elected to draw a line (the Box) even though it knew the hazardous substances were flowing from upstream of the Box and exiting downstream from the Box. To rule that the EPA designated the entire Basin as the Box is inconsistent with the statements and actions of the EPA, would prevent the Defendants and others from having a meaningful opportunity to challenge the listing of the Basin on the NPL (since the 60 day challenge period would have expired in 1983), and would be inconsistent with a plain reading of the limiting phrase of the statute (a facility listed on the NPL).

Alternatively, the government argues that the phrase '[w]ith respect to any facility listed on the National Priorities List (NPL)' means that any contamination concerning the listed facility should be included. Again, the Court respectfully disagrees. Under a plain reading of the statute, the phrase 'with respect to' is transitional and applies to all three exceptions in the special statute of limitations (i.e. with respect to NPL listed facilities, with respect to federal facilities and with respect to facilities where remedial actions are otherwise scheduled).

When determining the boundaries for the facility listed on the NPL, the Court should consider EPA's description of the NPL site boundaries. The Court agrees with the Defendants that EPA knows how to expand the

boundaries of a NPL listed site and has failed to do so in this particular case.[24] As stated by the Defendants, to find that the NPL listing includes the Basin isn't a minor modification of the site description, it expands the listing from 21 miles to at least 1500 miles.

The recent *Montrose* case has been cited to the Court as authority for finding that the EPA had authority to expand the boundaries of the NPL listed site for Bunker Hill. The Court finds that the *Montrose* decision holds that the EPA may broaden the boundaries of a site listed on the NPL, but the EPA must adhere to CERCLA's procedures for doing such. The EPA knows it cannot simply change the NPL boundaries by the issuance of a press release and the *Montrose* decision does not support a conclusion that the boundaries have been expanded in this case.

### f. Conclusion.

In applying the special statute of limitations, the NPL listed facility is limited to the Box, at this time. Therefore, the USA's NRD action regarding the Basin can not be considered timely filed as the Basin is not currently included facility boundaries of the site listed on the NPL which benefits from the special statute of limitations.

### 4. Motions by Third Parties to file Amicus Briefs.

A number of parties have moved the Court for leave to file amicus briefs on the statute of limitations issue discussed above. The Court has reviewed the proposed amicus briefs and finds that they are not timely filed and that they fail to aid the Court in resolving a complex issue. Counsel in the case have field extensive briefing on the issues and the Court does not find it necessary to seek additional briefing from non-parties. The motions for leave to file amicus briefs are therefore denied.

### ORDER

Being fully advised in the premises, the Court **HEREBY ORDERS** that:

1. USA's Motion to Strike all References to Inadvertently Produced Privileged EPA Memorandum (Docket No. 316) is **GRANTED.** The Court will not consider the March 20, 1996 memorandum in rendering its decision, but the memorandum does not have to physically stricken from the record in this matter. The Motion to Return the Privileged Document (Docket No. 334) is **DENIED** as the parties are all aware of the document and cannot erase their knowledge of the document. However, the Court orders the Defendants to refrain from citing the document in any future discovery or pleadings.

2. Defendants. Motions to Strike Testimony of Randall Smith (Docket No. 291 and 298) are **GRANTED IN PART AND DENIED IN PART** consistent with this order.

3. Defendants. Motions for Partial Summary Judgment on the issue of the statute of limitations on USA's NRD actions (Docket Nos. 229 and 258) are **GRANTED** consistent with this Memorandum Decision and Order. The scope of the USA's NRD claim shall be limited to the Box as the claims for the rest of the Coeur d'Alene Basin are not timely filed. This ruling has no impact on the NRD claims of the Tribe associated with the Coeur d'Alene Basin. Because of the impact this ruling will have on the scope of the litigation and the issue is a one of first impression, the Court grants leave to the parties to file an interlocutory appeal on portion of the order dealing with the cross motions for summary judgment based on § 9613(g).

4. USA's cross motion for summary judgment on the issue of statute of limitations (Docket No. 271) is **DENIED** consistent with this Memorandum Decision and Order.

5. Motions for Leave to File Amicus Briefs by third parties (Docket Nos. 356, 373, 376 and 385) are **DENIED.**

6. USA Motion for Protective Order Barring Rule 30(b)(6) Depositions is **DENIED WITHOUT PREJUDICE** based upon the

---

**24.** The Court is specifically not deciding whether the Court's ruling on the statute of limitations would change if the EPA extends the boundaries of the Bunker Hill Site through proper regulatory channels.

Court's ruling on August 28, 1998 (Docket No. 424) limiting depositions in this case.