Bernadette DIPACE, et al., Plaintiffs,

v.

Glenn S. GOORD, et al., Defendants.

No. 02 Civ. 5418 WHP GWG.

United States District Court,
S.D. New York.

Nov. 12, 2003.

Joan Magoolaghan, Koob & Magoolaghan, New York City, for Plaintiffs.

Daniel Schulze, Lee Alan Adlerstein, Assistant Attorneys General of the State of New York, New York City, for Defendants.

## OPINION AND ORDER

GORENSTEIN, United States Magistrate Judge.

Defendants Glenn S. Goord, the Commissioner of the New York State Department of Correctional Services ("DOCS"), and James L. Stone, the Commissioner of the New York State Office of Mental Health ("OMH"), have moved for a protective order under Rule 26(c) of the Federal Rules of Civil Procedure with respect to a letter dated September 1, 1999 from Commissioner Goord to Commissioner Stone. The defendants seek protection for the letter based on the deliberative process privilege. Plaintiffs have opposed the defendants' motion on the grounds that the deliberative process privilege either does not apply or has been waived. For the reasons stated below, defendants' motion is granted.

## I. INTRODUCTION

### A. Plaintiffs' Allegations

On August 10, 1999, Ralph Joseph Tortorici committed suicide while he was in the custody of DOCS at the Sullivan Correctional Facility in Fallsburg, New York. First Amended Complaint, filed August 1, 2002 (Docket # 2) ("Am.Compl."), ¶¶ 1, 15, 45. Less than a month earlier, he had been discharged from the Central New York Psychiatric Center ("CNYPC"), a maximum security inpatient hospital operated by OMH

for DOCS inmates in need of forensic mental health services. See id. ¶ 21; Declaration in Opposition to Defendants' Motion to Compel Return of Documents Independently Obtained by Plaintiffs, filed August 28, 2003 (Docket # 40) ("Pl.Decl."), ¶ 2; Declaration of Harold Smith in Support of Defendant's [sic] Motion for an Order to Compel Plaintiffs to Return Privileged Document, filed August 12, 2003 (Docket # 38) ("Smith Decl."), ¶ 1.

The plaintiffs in this case are the Administratrix of the Estate of Tortorici and other parties related to Tortorici. Their main claim is that Tortorici's suicide resulted from DOCS and OMH's failure to create discharge criteria that adequately addressed Tortorici's need for inpatient psychiatric treatment. See Am. Compl. ¶¶ 17, 76, 79, 82. They also allege that Tortorici was discharged not because it was medically appropriate to do so but rather because CNYPC had limited inpatient capacity. See id.; Pl. Decl. ¶ 2. The plaintiffs allege that CNYPC's discharge criteria "compelled the discharge of any prisoner who remain[ed] hospitalized for a period of one continuous year, despite the patient's ongoing need for inpatient psychiatric treatment." Am. Compl. ¶ 23. Defendants deny plaintiffs' allegations as to the reasons for Tortorici's release and contend that Tortorici was released from CNYPC because "in the judgment of the treatment team, he had been psychiatrically stabilized and did not require further acute inpatient treatment at that time." Smith Decl. ¶ 3.

### B. The Instant Motion

In May 2003, the defendants wrote a letter to the Court seeking to preclude the plaintiffs from taking the depositions of Commissioners Goord and Stone. See Declaration of Daniel Schulze in Support of Motion for an Order to Compel Plaintiffs to Return Privileged Document, filed August 12, 2003 (Docket # 39) ("Schulze Decl."), ¶ 2. Plaintiffs' letter in response attached a two-page letter dated September 1, 1999, from Commissioner Goord to Commissioner Stone (the "Goord Letter"), which is the subject of the instant motion. See id. Approximately four hours after receiving plaintiffs' letter, counsel for

the defendants telephoned plaintiffs' counsel and requested that the Goord Letter be returned as a document protected by the deliberative process privilege. *See id.* ¶ 4. Plaintiffs' counsel declined to return the Goord Letter but agreed to hold it in confidence pending a conference before the District Judge. *See id.* At this conference, plaintiffs' counsel agreed to keep the Goord Letter in confidence until the instant motion was decided. *See id.*

### C. The Relationship Between DOCS and OMH with Respect to Inmate Care

Prior to the sending of the Goord Letter, the staffs of DOCS and OMH met on July 21, 1999. *See* Declaration of Anthony J. Annucci in Support of Defendants' Motion for an Order to Compel Plaintiffs to Return Privileged Document, filed August 12, 2003 (Docket # 37) ("Annucci Decl."), ¶ 5. This meeting was one of multiple regular staff meetings between DOCS and OMH at which the agencies discussed issues relating to the treatment of mentally ill inmates. *See id.* One of the July 21 meeting's primary purposes was "to discuss the framework through which the agencies would continue to cooperate in setting policies." *Id.* At this meeting, Commissioners Goord and Stone signed on behalf of DOCS and OMH a Memorandum of Understanding which recognized the agencies' "mutual goals of ensuring that DOCS facilities remain safe and that DOCS inmates receive the highest quality of mental health care, and that they must work cooperatively to achieve these goals," Memorandum of Understanding Between the New York State Office of Mental Health and the New York State Department of Correctional Services, dated July 21, 1999 ("MOU") (reproduced as Ex. A to Annucci Decl.), at 1. *See* Annucci Decl. ¶ 5. The July 21 meeting also resulted in the tentative formation of an interagency work group, which was designed to make policy recommendations in support of the agencies' mutual goals. *Id.; see* Goord Letter at 1.

The MOU provides, *inter alia,* that (1) the Commissioners of DOCS and OMH would meet on at least a yearly basis, MOU § III.D.1, at 35, (2) "OMH and DOCS agree that coordination of budget initiatives will occur, resulting in a shared budget strategy and methodology for linking OMH service resources to DOCS inmate service needs," *id.* § III.D.2, at 35, (3) "OMH and DOCS will mutually agree upon capital projects necessary to support all mandated OMH services to DOCS inmates," *id.* § III.D.3, at 35, (4) "DOCS and OMH will confer prior to either agency making any changes in departmental or facility policies which directly affect the provision of OMH services and/or inmate access to mental health services," *id.* § III.D.5, at 35–36, (5) "OMH and DOCS will confer prior to either agency taking any action with respect to opening or closing OMH programs or any changes in the Mental Health Service Level of DOCS facilities," *id.* § III.D.6, at 36, (6) "DOCS and OMH will engage in a joint effort to develop, monitor and change mutual policy and procedures to govern programs, program management and sharing of patient information," *id.* § III.D.7, at 36, (7) "OMH and DOCS will jointly assess mental health service needs and work collaboratively to develop appropriate programs to address identified needs," *id.* § III.G.1, at 40, and (8) "DOCS and OMH agree to share data, facilities and programs for budgetary and service need forecasting," including the "number of inmates being served by OMH, OMH staffing information, CNYPC inpatient admission and discharge numbers and general OMH caseload statistics for specific correctional facilities," *id.* §§ III.H.1–.2, at 42.

The Goord Letter, which the Court has reviewed *in camera,* makes reference to the July 21 meeting and the MOU. *See* Goord Letter at 1. Without disclosing the allegedly privileged matter it contains, the letter may be summarized as follows: it begins by noting that it is a follow-up to the July 21 meeting. *See id.* It then discusses the issue of inpatient care of DOCS inmates, including a reference to Tortorici's suicide, and a proposal relating to the number of inmate beds at CNYPC. *See id.* at 1–2. Commissioner Goord expresses his availability to discuss the proposal with Commissioner Stone and offers to provide his personal appeal to the Division of the Budget in support of the proposal. *See id.* at 2. The letter concludes by expressing appreciation for OMH's efforts

in serving the mentally ill and by reiterating the importance of continued positive collaboration in achieving the agencies' mutual goal of providing professional mental health care. *See id.*

According to defendants, the proposal in the Goord Letter "was the subject of several further rounds of discussion between the agencies" but "[u]ltimately no budgetary approval and/or Legislative approval was sought for the proposal set forth in the Goord Letter that year." Annucci Decl. ¶ 8.

## II. DISCUSSION

### A. The Deliberative Process Privilege

#### 1. Applicable Legal Principles

 The deliberative process privilege is a "sub-species" of the work product doctrine. *See Tigue v. United States Dep't of Justice,* 312 F.3d 70, 76 (2d Cir.2002), *cert. denied,* ── U.S. ──, 123 S.Ct. 2214, 155 L.Ed.2d 1105 (2003). It has also been called the "official information" privilege, the "intragovernmental opinion" or "governmental opinion" privilege, and the "executive" privilege. *See Walsh v. Chittenden Corp.,* 799 F.Supp. 405, 407 n. 3 (D.Vt.1992); *Shell Oil Co. v. IRS,* 772 F.Supp. 202, 205 n. 3 (D.Del.1991). The privilege shields from disclosure intra-agency or inter-agency " 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)); *see also* 5 U.S.C. § 552(b)(5) (incorporating the deliberative process privilege through its exemption from disclosure under the Freedom of Information Act of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency"). Restated, the privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d

473, 482 (2d Cir.1999) (internal quotation marks and citations omitted). As a matter of policy, the privilege

> rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

*Klamath Water Users Protective Ass'n,* 532 U.S. at 8–9, 121 S.Ct. 1060 (internal quotation marks and citations omitted).

 The privilege applies to both intra-agency and inter-agency communications. *See, e.g., Tigue,* 312 F.3d at 77; *Allstate Ins. Co. v. Serio,* 1998 WL 477961, at *3 (S.D.N.Y. Aug. 13, 1998). For a particular inter-agency or intra-agency document to be protected by the privilege, the agency must show that the document is both "predecisional" and "deliberative." *See, e.g., Tigue,* 312 F.3d at 76; *Grand Cent. P'ship,* 166 F.3d at 482; *Azon v. Long Island R.R.,* 2001 WL 1658219, at *1 (S.D.N.Y. Dec. 26, 2001).

 A document is "predecisional" when it is " 'prepared in order to assist an agency decisionmaker in arriving at his decision.' " *Hopkins v. United States Dep't of Hous. & Urban Dev.,* 929 F.2d 81, 84 (2d Cir.1991) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975)). This element distinguishes "predecisional" documents prepared before a final agency decision, which are protected, from "postdecisional memoranda setting forth the reasons for an agency decision already made," which are not. *Grumman Aircraft Eng'g Corp.,* 421 U.S. at 184, 95 S.Ct. 1491; *accord Resolution Trust Corp. v. Diamond,* 137 F.R.D. 634, 641 (S.D.N.Y.1991) (privilege does not cover "materials related to the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy").

 A document is "deliberative" if it is " 'actually ... related to the process by which policies are formulated.' " *Hopkins,*

929 F.2d at 84 (alteration in original) (quoting *Jordan v. United States Dep't of Justice,* 591 F.2d 753, 774 (D.C.Cir.1978) (en banc)). Thus, the privilege does not protect " 'a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment.' " *Grand Cent. P'ship,* 166 F.3d at 482 (quoting *Ethyl Corp. v. EPA,* 25 F.3d 1241, 1248 (4th Cir.1994)). While an agency

> need not actually demonstrate that a specific decision was made in reliance on the allegedly predecisional material, [the agency] must show that the material was prepared to assist the agency in the formulation of some specific decision. In other words, while the agency need not show *ex post* that a decision was made, it must be able to demonstrate that, *ex ante,* the document for which [the deliberative process] privilege is claimed related to a specific decision facing the agency.

*Tigue,* 312 F.3d at 80 (citing *Sears, Roebuck & Co.,* 421 U.S. at 151 n. 18, 95 S.Ct. 1504; *Maricopa Audubon Soc'y v. United States Forest Serv.,* 108 F.3d 1089, 1094 (9th Cir. 1997)).

Plaintiffs contend that the proposal in the Goord Letter was part of "a long term, eight (8) year project, for which the state legislative [sic] has appropriated funds from as early as 1992" and, therefore, that "any communications had in 1999 regarding the project cannot be deemed either ['predecisional'] or 'deliberative.' " Pl. Decl. ¶ 5; *see id.* ¶¶ 12–13. The two elements of the privilege will be considered in turn.

### 2. *"Predecisional"*

 To determine whether the Goord Letter is predecisional, the Court must determine "the function of the document[ ] in issue in the context of the administrative process which generated [it]." *Sears, Roebuck & Co.,* 421 U.S. at 138, 95 S.Ct. 1504. In the MOU, DOCS and OMH agreed to "confer prior to either agency making any changes in departmental or facility policies which directly affect the provision of OMH services and/or inmate access to mental health services." MOU § III.D.5, at 35–36. Indeed, DOCS and OMH are directed by statute to cooperate in setting policies for the care of mentally ill DOCS inmates. *See* N.Y. Correct. Law § 401 ("The commissioner [of DOCS], in cooperation with the commissioner of [OMH], shall establish programs in such correctional facilities as he may deem appropriate for the treatment of mentally ill inmates...."). Furthermore, the agencies also agreed in the MOU to jointly pursue budget initiatives. *See* MOU § III.D.2, at 35 ("OMH and DOCS agree that coordination of budget initiatives will occur, resulting in a shared budget strategy and methodology for linking OMH service resources to DOCS inmate service needs.").

The proposal set forth in the Goord Letter directly implicates these mandates. In it, Commissioner Goord proposed to Commissioner Stone that DOCS and OMH jointly pursue an initiative with budgetary implications regarding the number of inmate beds at CNYPC. *See* Goord Letter at 1–2. Because OMH and DOCS—by statute and by the terms of the recently-executed MOU— each played a role in setting policies affecting inmates at CNYPC, the Goord Letter was sent to assist Commissioner Stone in deciding whether to pursue the proposal described in the letter. *See, e.g., Grand Cent. P'ship,* 166 F.3d at 482 ("A document is predecisional when it is prepared in order to assist an agency decisionmaker in arriving at his decision." (internal quotation marks and citations omitted)); *see also Pub. Citizen, Inc. v. Dep't of Justice,* 111 F.3d 168, 170 (D.C.Cir.1997) (relying on the fact that a consultative relationship between two agencies and the President was "not only explicit but [was] mandated by statute" in determining that communications between them were "peculiarly appropriate" for protection under the privilege). Indeed, the Goord Letter strongly encourages Commissioner Stone to support the proposal and states that Commissioner Goord would intercede with the Division of the Budget if the proposal went forward. *See* Goord Letter at 2. The Goord Letter thus was communicating only Commissioner Goord's proposal and not announcing a joint decision of the agencies that had already been made.

 Moreover, after the Goord Letter was executed "[u]ltimately no budgetary ap-

proval and/or Legislative approval was sought for the proposal set forth in the Goord Letter that year." Annucci Decl. ¶ 8. Because the privilege protects information regarding policies " 'before they have been finally formulated or adopted,' " *Grand Cent. P'ship,* 166 F.3d at 481 (quoting *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980)), the subsequent decision not to pursue the Goord Letter's proposal demonstrates that it had not been adopted at the time it was made. *See Heggestad v. United States Dep't of Justice,* 182 F.Supp.2d 1, 8–9 (D.D.C.2000) (concluding that memoranda recommending that prosecution be declined "were not the final disposition of the case [and were thus predecisional], because a decision was subsequently made to prosecute and the prosecution did in fact occur"). Thus, this is not a case where the agency policy had been finally effectuated at the time the letter was written. As the Supreme Court has indicated, one of the underlying considerations favoring disclosure is not implicated when a proposal is not ultimately adopted: "The public is only marginally concerned with reasons supporting a policy which an agency has rejected." *Sears, Roebuck & Co.,* 421 U.S. at 152, 95 S.Ct. 1504.

While defendants have not identified a precise moment in time when OMH and DOCS decided not to pursue the proposal, "the fact that the government does not point to a specific decision made by the [agency] in reliance on the [allegedly privileged document] does not alter the fact that the [document] was prepared to assist [agency] decisionmaking on a specific issue." *Tigue,* 312 F.3d at 80; *accord Sears, Roebuck & Co.,* 421 U.S. at 151 n. 18, 95 S.Ct. 1504 ("Our emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared."). Therefore, the proposal in the Goord Letter—one that was subsequently rejected and never ultimately adopted—could not have been final agency policy.

Plaintiffs argue that the Goord Letter was not "predecisional" because it "speaks to a policy initiative that was first proposed and began in 1992, and was well underway by 1999" when the Goord Letter was sent. Pl. Decl. ¶ 13. In support of this argument, they point to various documents created years prior to the Goord Letter discussing the issue of services and bed capacity at CNYPC. *Id.* ¶¶ 7–12; *see* Diane Steelman, The Corr. Ass'n of N.Y., *The Mentally Impaired in New York's Prisons: Problems and Solutions* (reproduced in part as Ex. A to Pl. Decl.), at 27–28; *NYS OMH Task Force on the Future of Forensic Services: Report of the Subcommittee on Prison Mental Health Services,* dated January 31, 1997 (*"OMH Task Force Report"*) (reproduced in part as Ex. B to Pl. Decl.), at 19, 26; *see also* Mary Beth Pfeiffer, *Suicides Soar; Psychiatric Resources Lag,* Poughkeepsie J., Dec. 16, 2001 (reproduced as Ex. E to Pl. Decl.) (noting that the *OMH Task Force Report* was an "unreleased 1997 report" that "never got out of the draft stage"). Plaintiffs point in particular to language in the 1997 *OMH Task Force Report* to argue that the proposals made in the 1999 Goord Letter derived from an "eight-year plan" that had been initiated in fiscal year 1992–93. *See OMH Task Force Report* at 26. Thus, plaintiffs argue that DOCS and OMH did not first determine to address these issues in 1999 but merely were applying an already-existing policy. *See generally* Pl. Decl. ¶¶ 12–13.

The problem with plaintiffs' argument is that the policy area at issue—the capacity to deliver services to mentally ill inmates—was obviously a fluid one. The fiscal year 1992–93 eight-year plan was just that—a "plan"—not a final agency decision with respect to the number of beds at CNYPC. Its lack of finality is demonstrated by the fact that the plan had not been effectuated as late as September 1999 when the Goord Letter was sent. In addition, the eight-year plan was not self-executing but could only come into effect with approvals from the relevant divisions of State government. Thus, whatever policy is expressed in the fiscal year 1992–93 plan was not a final agency "decision." As the Supreme Court has explained:

Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations

which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process.

*Sears, Roebuck & Co.*, 421 U.S. at 151 n. 18, 95 S.Ct. 1504; *see Assembly of Cal. v. United States Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir.1992) (one of the privilege's purposes is "to allow agencies freely to explore possibilities"). The lack of finality in the present case is further illustrated by the fact that DOCS and OMH ultimately agreed *not* to pursue the proposal in the Goord Letter. *See* Annucci Decl. ¶ 8. Accordingly, the Goord Letter was "predecisional."

### 3. *"Deliberative"*

■ The Goord Letter was also "deliberative" because it was " 'actually . . . related to the process by which policies are formulated,' " *Hopkins*, 929 F.2d at 84 (alteration in original) (quoting *Jordan*, 591 F.2d at 774). Indeed, the MOU contemplated that the Commissioners of DOCS and OMH would meet at least on an annual basis and that "coordination of budget initiatives [would] occur." MOU §§ III.D.1–.2, at 35. The MOU also provided that "DOCS and OMH [would] confer prior to either agency making any changes in departmental or facility policies which directly affect the provision of OMH services and/or inmate access to mental health services." *Id.* § III.D.5, at 35–36. This collaboration is also mandated by statute. *See* N.Y. Correct. Law § 401. The Goord Letter was plainly in furtherance of this collaboration. *See, e.g.,* Annucci Decl. ¶ 6; Declaration of John V. Tauriello in Support of Defendants' Motion for an Order to Compel Plaintiffs to Return Privileged Document, filed August 12, 2003 (Docket # 36) ("Tauriello Decl."), ¶ 4. Because the Goord Letter "formed an essential link in a specified consultative process," *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks and citation omitted), it qualifies as "deliberative."

■ In sum, the Goord Letter was both "predecisional" and "deliberative." Therefore, it is protected by the deliberative process privilege unless the privilege has been waived.

### B. *Waiver*

■ Plaintiffs argue in the alternative that the privilege has been waived because the Goord Letter "was released by OMH and/or DOCS as early as 2000, was the subject of testimony before a Senate Democratic Task Force, was introduced into a public record, and was quoted from extensively in a newspaper article that is available on the world wide web." Pl. Decl. ¶ 17. Plaintiffs do not reveal how they themselves obtained the Goord Letter, although they have offered to do so *ex parte. See id.* ¶ 3 n. 2. In any event, they have not suggested that the manner in which they obtained the document reflects any waiver on the part of the defendants.

In opposing the plaintiffs' argument, defendants have submitted evidence that they never authorized public disclosure of the Goord Letter and that they are unaware of any occasion when the Goord Letter was shared by anyone at DOCS or OMH with anyone outside of DOCS or OMH. *See* Annucci Decl. ¶ 10; Tauriello Decl. ¶ 6. Plaintiffs do not contradict this evidence. Rather, their argument regarding waiver is premised on two events, neither of which is in dispute: (1) in December 2000, the Goord Letter was one of two letters annexed to testimony offered by Prisoners' Legal Services to the Senate Democratic Task Force on Criminal Justice Regarding Conditions in Special Housing Units in New York State Correctional Facilities, Pl. Decl. ¶¶ 15–16 (citing N.Y. Pub. Off. Law § 88(2)); and (2) the *Poughkeepsie Journal* published an article that contained direct quotations from the Goord Letter on December 16, 2001, the contents of which are still available over the Internet, *id.* ¶ 16; *see* Mary Beth Pfeiffer, *Suicides Soar; Psychiatric Resources Lag*, Poughkeepsie J., Dec. 16, 2001, *available at* http:// www.poughkeepsiejournal.com/projects/suicide/po121601s4.shtml (reproduced as Ex. E to Pl. Decl.).

■ Case law makes clear, however, that these events cannot justify concluding that the defendants have waived the privilege. While disclosure of otherwise privileged material to a non-governmental recipient may result in a waiver, no waiver will be found

unless that disclosure was "authorized" by the governmental agency and "voluntary." See *City of Virginia Beach v. United States Dep't of Commerce*, 995 F.2d 1247, 1253 (4th Cir.1993); *accord Fla. House of Representatives v. United States Dep't of Commerce*, 961 F.2d 941, 946 (11th Cir.), *cert. dismissed*, 506 U.S. 969, 113 S.Ct. 446, 121 L.Ed.2d 363 (1992); *Shell Oil Co.*, 772 F.Supp. at 209; *Peck v. United States*, 514 F.Supp. 210, 212 (S.D.N.Y.1981); *see also Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 856 (3d Cir.1995) (no waiver where privileged materials were subject of "inadvertent" disclosure), *cert. denied*, 516 U.S. 1071, 116 S.Ct. 772, 133 L.Ed.2d 725 (1996). Thus, the mere fact that the Goord Letter was made available publicly by Prisoners' Legal Services and the *Poughkeepsie Journal* does not show that OMH or DOCS voluntarily authorized its release to anyone.

The facts of this case are similar to *Overby v. United States Fidelity & Guaranty Co.*, 224 F.2d 158, 163 (5th Cir.1955), in which bank directors authorized to see a government report made an unauthorized disclosure to their attorneys and auditors. In concluding that the government's "official information" privilege had not been waived, *Overby* held that "[t]he privilege belongs to the Government and ... can neither be claimed nor waived by a private party." *Id.* (internal quotation marks and citation omitted). Similarly, no waiver was found in *Safeway Stores Inc. v. FTC*, 428 F.Supp. 346, 347 (D.D.C. 1977), in which an FTC staff report, after having been transmitted to certain congressional committees, was "leaked" to the Washington Post. The court rejected the argument that the newspaper's publication of an article on the report waived the applicability of the privilege. *Id.; accord United States v. Alex. Brown & Sons, Inc.*, 169 F.R.D. 532, 543–44 & n. 6 (S.D.N.Y.1996) (no waiver of privileges, including deliberative-process privilege, even though privileged document was apparently shared with members of the press "since it is not possible to identify the parties responsible for this disclosure"), *aff'd*, 153 F.3d 16 (2d Cir.1998).

As far as this Court is aware, in each case finding a waiver on the ground that an otherwise privileged document was made publicly available, evidence existed that the agency had actually authorized the document's release. *See, e.g., North Dakota ex rel. Olson v. Andrus*, 581 F.2d 177, 179, 182 n. 9 (8th Cir.1978) (document voluntarily disclosed in discovery to opposing counsel); *Shell Oil Co.*, 772 F.Supp. at 211 (agency employee read aloud the contents of privileged document at a meeting attended by non-governmental entities); *Education/Instruccion, Inc. v. United States Dep't of Hous. & Urban Dev.*, 471 F.Supp. 1074, 1081 (D.Mass.1979) (document provided voluntarily to outside entity and "there [was] no contention ... that the disclosure was unauthorized"). Plaintiffs have cited no case law to the contrary.

In sum, because there is no evidence that the defendants voluntarily made the Goord Letter public, no waiver occurred and the privilege remains intact.

*Conclusion*

 Defendants' motion for a protective order is granted. To enforce their claim to privilege, defendants seek an order requiring the plaintiffs to give their copy of the Goord Letter to the defendants' counsel. But as was true in *United States v. ASARCO Inc.*, 28 F.Supp.2d 1170, 1181 (D.Idaho 1998), *vacated on other grounds*, 214 F.3d 1104 (9th Cir.2000), "the parties are all aware of the document and cannot erase their knowledge of [it]." Additionally, the plaintiffs apparently did not receive this letter as a consequence of any court-ordered process, such as discovery, and therefore it is unclear that it is within the Court's power to order the physical return of the document.

It will be sufficient to enforce this Court's interest in protecting the privilege to direct that plaintiffs not make use of the Goord Letter. Accordingly, the plaintiffs are hereby ORDERED to refrain from using or referencing the Goord Letter in any manner in this case.